W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Appellee,

v.

MODERN TRASHMOVAL, INC., a corporation, Appellant.

W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Appellee and Cross-Appellant,

v.

MODERN TRASHMOVAL, INC., a corporation, Appellant and Cross-Appellee (two cases).

Nos. 8828–8830.

United States Court of Appeals Fourth Circuit.

Argued June 7, 1963.

Decided Sept. 23, 1963.

Charles G. Page, Baltimore, Md. (White, Page & Lentz, Baltimore, Md., on brief), for appellant and cross-appellee.

Charles Donahue, Solicitor of Labor, and Jack H. Weiner, Atty., U. S. Dept. of Labor (Bessie Margolin, Assoc. Solicitor, Jacob I. Karro, Atty., and Ernest N. Votaw, Regional Atty., U. S. Dept. of Labor, on brief), for appellee and cross-appellant.

Before HAYNSWORTH and BOREMAN, Circuit Judges, and LEWIS, District Judge.

BOREMAN, Circuit Judge.

## I

### FACTUAL BACKGROUND

(a) *Court Proceedings.*

These appeals involve three actions brought in the United States District Court for the District of Maryland by the Secretary of Labor under the Fair Labor Standards Act,[1] herein called the Act. In case No. 8828 the Secretary sought an injunction against violations of the wage and record-keeping requirements of the Act by Modern Trashmoval, Inc. (herein referred to as defend-

1. 29 U.S.C.A. § 201 et seq.; 52 Stat. 1060 (1938), as amended by 63 Stat. 910 (1949) and 64 Stat. 1263 (1950). The

Fair Labor Standards Amendments of 1961 (75 Stat. 65) do not apply to this case.

ant or Modern) and Francis P. E. Bohager, its president.[2] In cases Nos. 8829 and 8830 the Secretary sought to recover from Modern unpaid compensation alleged to be due under the Act[3] to nineteen of Modern's employees for work performed between April 1, 1959, and March 29, 1961. Because identical issues of coverage under the Act were involved, the three suits were consolidated for trial.

The District Court[4] held that the nineteen use-plaintiffs were covered by the Act because engaged in work "closely related" and "directly essential" to the production of goods for commerce; that Modern was not exempt as a "retail or service establishment" under section 13 (a) (2) of the Act;[5] and that Modern, although in violation of the Act, had acted in good faith on the advice of counsel. The court declined to issue the requested injunction and dismissed that suit, but it rendered judgments for the plaintiffs in the two wage suits. Modern appeals from the judgments adverse to it in the wage suits, and also appeals from the ruling, common to all three actions, that the activities of its employees were subject to the provisions of the Act. The Secretary of Labor cross-appeals from the judgments in the wage suits on the ground that the District Court erred in not allowing interest on the wages withheld.[6]

(b) *Description of Modern's Business and the Activities of its Employees.*

Defendant Modern is a Maryland corporation engaged exclusively in the collection and disposal of garbage, rubbish, debris and industrial waste in the City of Baltimore and its environs. With the exception of a small amount of cardboard resold during the period covered by the proof (April 1, 1959, through March 29, 1961) and later to be mentioned, the material collected is and was either destroyed by incineration or dumped within the State of Maryland. At the times in question, Modern's employment totaled approximately thirty-two persons of whom twenty-four were drivers and helpers. The nineteen use-plaintiffs here were among approximately fifty who worked as drivers and helpers during the two-year period for which compensation was sought. Drivers and helpers proceed in Modern's trucks to the locations on customers' premises where trash has been accumulated in containers by the customers, empty the containers or load them full onto the truck, and then haul the unsorted trash and garbage to an incinerator or dump for final destruction or burial. No labor skills are needed for this work other than the requirement that each driver be able to operate his truck and remember his route.

Three alternative types of service are provided by Modern depending primarily

2. The injunctive suit was brought under 29 U.S.C.A. § 217; 52 Stat. 1069 (1938), as last amended by 75 Stat. 74 (1961).

3. The two wage suits were brought under 29 U.S.C.A. § 216(c) which states in pertinent part:
   (c) * * * When a written request is filed by any employee with the Secretary of Labor claiming unpaid minimum wages or unpaid overtime compensation under section 206 or section 207 of this title, the Secretary of Labor may bring an action in any court of competent jurisdiction to recover the amount of such claim: *Provided,* That this authority to sue shall not be used by the Secretary of Labor in any case involving an issue of law which has not been settled finally by the courts, and in any such case no court shall have

jurisdiction over such action or proceeding initiated or brought by the Secretary of Labor if it does involve any issue of law not so finally settled." 63 Stat. 919 (1949); 64 Stat. 1263 (1950).

4. The opinion of the District Court, reported at 207 F.Supp. 596 (D.Md.1962), sub. nom. Goldberg v. Modern Trashmoval, Inc., should be read in conjunction with this opinion.

5. 29 U.S.C.A. § 213(a) (2), see footnote 11, infra.

6. Francis P. E. Bohager, president of Modern, is not subject to the judgments for back wages and, therefore, has not appealed. The Secretary of Labor did not appeal from the dismissal of the injunction suit.

upon the volume of trash to be collected. At so-called "container stops," Modern furnishes containers two to six cubic yards in size and collects the accumulated trash, using a specially designed truck known as a Dumpmaster which, by mechanical means, lifts each container, dumps it contents into the truck, compacts the trash in the truck and replaces the empty container on the customer's premises, taking approximately two to three minutes' time per container. Normally, the Dumpmaster is operated by a driver without a helper. At "hand stops" a driver and his helper manually carry and dump standard garbage cans, usually owned by the customer. The time required for a "hand stop" can vary from two minutes up to forty minutes with the average time estimated at twenty minutes. The third type of service, termed "miscellaneous," is devoted to answering special calls from regular customers and calls from one-time customers. The "container stops" and "hand stops" are served at regular intervals from once a week to twice a day by drivers and helpers assigned to regular routes.

At the trial below uncontradicted evidence showed that trash-collection service is available to anyone in Baltimore and vicinity upon calling Modern's office. However, most of Modern's business consists of regular route collections from commercial establishments, some of which are engaged in producing goods for interstate commerce. One of Modern's witnesses estimated that not over 10% to 15% of its customers were industrial or manufacturing firms. No special discounts are given to particular classes of customers, and charges to all customers are based on the time required to collect trash at that location, the volume of trash handled and competition in the area. Modern's drivers and helpers are not in any way concerned with the business or productive activities of customers. Drivers merely need to know the location of the customer's collection point and how frequently to stop there. Because the price of

Modern's service is in part dependent upon time, most trash containers are so located as to provide convenient access for trucks and to facilitate rapid collection. To maintain a more attractive appearance, a relatively small number of customers place containers in an inclosure and require the trash collectors to summon assistance before entering. Some large containers owned by Modern are mounted on wheels and moved about the premises while the customer loads them with trash, but Modern's employees do not enter the customer's premises to pick up scattered trash in general collections. The sole exception is certain "miscellaneous" calls in which Modern's employees are required to clear debris after a fire or to clean up a particular littered area.

Modern placed in evidence a charted analysis of its service stops and charges for the month of September 1961, the month in which suit was brought. The chart showed that in September 1961 Modern's trucks made a total of 20,112 stops representing total sales of $52,841.-13. Of the total number of stops, 38.41% were for charges of less than $1.00 per stop; 77.13% were for less than $4.00 per stop; only 3.45% were for charges of $10.00 or more per stop. The chart also showed that 66.50% of Modern's total sales for the month were made at prices of less than $6.00 per stop.

(c) *Evidence Relating the Occupations of the Use-Plaintiffs to Interstate Commerce.*

In an effort to obtain proof that the use-plaintiffs were engaged in work having sufficient relationship to interstate commerce to bring them within the coverage of the Act, the Secretary undertook extensive proceedings directed to identifying Modern's customers, their activities in commerce or in producing goods for commerce, and the contacts of the use-plaintiffs with customers having such activities related to interstate commerce. To avoid the inconvenience accompanying the resulting lengthy examination of its personnel and records, Modern agreed to a stipulation that each

of the nineteen use-plaintiffs, during each week of his employment by Modern between April 1, 1959, and March 29, 1961, collected trash from at least one customer who was then engaged in the production of goods for commerce. Six witnesses, each employed by a different customer of Modern, testified that cessation of Modern's collection service would cause various inconveniences at their respective production and distribution locations, and several of them suggested that, under certain circumstances, work stoppages could result (see discussion, 207 F.Supp. at 603–604). However, only four of these witnesses stated that shipments were made in interstate commerce from their places of business, no identification was made of particular use-plaintiffs as the employees serving these customers, and no proof was presented to show that these customers or their shipments in interstate commerce were representative of Modern's customers as a whole. Modern had between 800 and 1,000 customers during the period in question but, except with respect to the above mentioned six customers, there was no proof as to whether their activities affected interstate commerce, or as to the nature and extent of trash collection services rendered to customers in commerce or producing goods for commerce, the possible effects on commerce of interruption of that service, and the employment of the use-plaintiffs in serving such customers. Thus, on this record, the stipulation merely states that, during the period in suit and his employment, each use-plaintiff worked a minimum of two to three minutes per week in collecting trash from an unidentified customer who was engaged in the production of goods for commerce.

(d) *Evidence on the "Cardboard Issue."*

A second and independent area of proof, termed the "cardboard issue" by the parties (as distinguished from the "removal of waste" issue described above), is claimed by the Secretary to be sufficient in itself to bring Modern's employees within the coverage of the Act. The District Court indicated willingness to rely upon this issue and it is therefore necessary to consider the record on this point. It was shown at the trial that during the two-year period covered by the complaints, Modern made separate collections of cardboard and waste paper from certain of its customers who were willing to segregate those items from their general trash. From time to time Modern collected this material and sold it to the local firm of Frank P. R. Bohager & Sons, Inc., hereinafter referred to as Bohager & Sons. The dollar amounts of sales of cardboard and paper were stipulated and, in the twelve months ending July 31, 1961, the sum of such sales was only about 7/10 of 1% of Modern's total sales for that fiscal year. The sale of these materials for a salvage value was permanently discontinued by Modern in October 1961. No evidence was offered to show what use was made of the salvaged cardboard and paper by Bohager & Sons, and the record contains no proof that any of the use-plaintiffs handled such materials. The purchasing agent for New Haven Board and Carton Company at Illchester, Maryland, testified that his firm had purchased salvaged cardboard from Bohager & Sons after April 1, 1959; that such cardboard would usually be placed by his company in storage and commingled with other salvaged material prior to its use in the manufacture of cartons and folding box board; and that these products are shipped to customers in various states on the eastern seaboard. No evidence was introduced to show the quantities of salvaged cardboard thus purchased from Bohager & Sons and there was no identification of the salvaged cardboard as having been previously acquired from Modern.

(e) *Wages and Hours Stipulated.*

It was stipulated by the parties that, during the period covered by the suits, many of Modern's drivers and helpers worked in excess of forty hours per week and there is no challenge to the District Court's finding that, if the use-plaintiffs are within the provisions of the Act, Modern's rates of pay for overtime work

did not meet the requirements of the Act.[7] The number of hours worked by each use-plaintiff during the period was also stipulated for purposes of computing any amounts of overtime, and in these appeals no question is raised regarding computation of the amounts of unpaid compensation claimed as due the use-plaintiffs.

## II

### WERE THE EMPLOYMENTS OF THE USE-PLAINTIFFS WITHIN THE COVERAGE OF THE ACT?

The question before us is whether, under the circumstances here presented, the use-plaintiffs are "engaged in commerce" or "in the production of goods for commerce" as those terms are defined under the Act.[8]

■ It is uniformly recognized that in enacting the Fair Labor Standards Act of 1938 the Congress did not exercise the full scope of its power to regulate commerce. See, e. g., Mitchell v. H. B. Zachry Co., 362 U.S. 310, 314–316, 80 S.Ct. 739, 4 L.Ed.2d 753 (1960); Mitchell v. Lublin, McGaughy & Associates, 358 U.S. 207, 211, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959); McLeod v. Threlkeld, 319 U.S. 491, 493, 63 S.Ct. 1248, 87 L.Ed. 1538 (1943); Kirschbaum Co. v. Walling, 316 U.S. 517, 522–523, 62 S.Ct. 1116, 86

L.Ed. 1638 (1942). The rejection of a proposal to adopt language making the Act applicable to employees "engaged in commerce in any industry affecting commerce," instead of the enacted language which applied the regulation of hours and wages to "each of his employees who is engaged in commerce or in the production of goods for commerce" (29 U.S.C.A. §§ 206, 207), indicated a Congressional purpose to leave local business to regulation by the states. See Mitchell v. H. B. Zachry Co., supra; McLeod v. Threlkeld, supra; Walling v. Jacksonville Paper Co., 317 U.S. 564, 570, 63 S.Ct. 332, 87 L.Ed. 460 (1943). In the absence of a provision for administrative determination, the primary responsibility for the application of the Act to particular fact situations has been vested in the courts and, although this process is essentially empirical, certain tests are useful in drawing the lines between the area of activity regulated by the Act and that left to the states for regulation.

■■ The activities of the employee, not those of the employer, are decisive on the question of the Act's coverage and the decision is governed by practical considerations rather than technical conceptions. See, e. g., Mitchell v. H. B. Zachry Co., supra; Mitchell v. Lublin, McGaughy & Associates, supra; Mitchell

---

7. The alleged violations arose under the requirements of 29 U.S.C.A. § 207 prior to its amendment by the Fair Labor Standards Amendments of 1961 (75 Stat. 69). The pertinent language, as amended in 1949 (63 Stat. 912), reads as follows:

   "§ 207. Maximum hours

   "(a) Except as otherwise provided in this section, no employer shall employ any of his employees who is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

8. The pertinent definitions are found in 29 U.S.C.A. § 203, as amended in 1949 (63 Stat. 911):

   "§ 203. Definitions
   "As used in this chapter—

   \*     \*     \*     \*     \*

   "(b) 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof.

   \*     \*     \*     \*     \*

   "(j) 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any closely related process or occupation directly essential to the production thereof, in any State."

v. C. W. Vollmer & Co., 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196 (1955); McLeod v. Threlkeld, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538 (1943); Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943); Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638 (1942). In considering the application of the law to the facts of record, it is advisable to consider three categories of employees whose activities are deemed to be within the coverage of the Act: (1) Those "engaged in commerce," (2) those "engaged in the production of goods for commerce" in a direct sense, and (3) those "engaged in any closely related process or occupation directly essential to the production of goods for commerce."

### (a) *Were They Employed "in Commerce"?*

In determining whether employees are "engaged in commerce" within the applicable provisions of the Act, the test is "whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated, local activity." Mitchell v. Lublin, McGaughy & Associates, supra, 358 U.S. at 212, 79 S.Ct. at 264, 3 L.Ed. 2d 243; Mitchell v. C. W. Vollmer & Co., supra, 349 U.S. at 429, 75 S.Ct. at 861, 99 L.Ed. 1196. As none of Modern's employees either crosses state lines in connection with his employment, handles goods directly moving in the channels of interstate commerce, or directly contributes to the repair or extension of facilities of interstate commerce (see e. g., Mitchell v. C. W. Vollmer & Co., supra), it is clear that the use-plaintiffs were not "engaged in commerce" within the meaning of the Act.[9] To the contrary, Modern's employees were and are engaged, almost exclusively, in the re-

moval of waste which lacks further utility and in the final destruction or disposition thereof. Far from feeding or supporting the interstate flow of commerce, these employees deposited the materials handled at an ultimate in-state destination.

### (b) *Were They "Engaged in Producing Goods for Commerce"?*

A second category of employee activity held to be within the coverage of the Act is "the production of goods for commerce" in the sense that the employee works directly on or handles goods which flow into interstate commerce either immediately or eventually. With regard to the activities of Modern's employees in removing trash and depositing it for final destruction in the State of Maryland, there is patently no possible application of the Act here on the basis of this category. However, before the trial court and again in this court, the Secretary contended that the sale by Modern of salvaged waste paper and cardboard to Bohager & Sons (the "cardboard issue" noted above) constituted "the production of goods for commerce" within the meaning of the Act. The evidence discussed above shows that the amount of Modern's business represented by these sales was extremely small (at all times probably less than 2% of gross sales) and would be *de minimus*, if that doctrine were applicable in these cases. But the cases have found employees within the coverage of the Act in spite of the relatively small proportion of the employer's business involved. See, e. g., Roland Electrical Co. v. Walling, 326 U.S. 657, 661, 66 S.Ct. 413, 90 L.Ed. 383 (1946), where the Act was applied on the basis of a stipulation that 33 of the "larger and most active accounts" out of a total of about 1,000 customers of an electrical contracting and sales business were either in interstate commerce or pro-

---

9. For quite distinguishable facts in cases applying the Act on the basis that employees were "engaged in commerce" see, e. g. Mitchell v. Lublin, McGaughy & Associates, supra; Mitchell v. C. W. Vollmer & Co., supra; Fitzgerald Const.

Co. v. Pedersen, 324 U.S. 720, 65 S.Ct. 892, 89 L.Ed. 1316 (1945); Overstreet v. North Shore Corp., 318 U.S. 125, 63 S. Ct. 494, 87 L.Ed. 656 (1943); Walling v. Jacksonville Paper Co., supra.

ducing goods for commerce; and Mabee v. White Plains Publishing Co., 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607 (1946), where about ½ of 1% of the circulation of a daily newspaper regularly went out of state and the Court held that employees of the publisher could be shown to be producing goods for commerce and therefore covered by the Act. While Mabee v. White Plains Publishing Co. expressly stated that the *de minimus* maxim cannot be applied relative to the volume of the employer's regular interstate business under 29 U.S.C.A. § 215 (a) (1), the Court observed that applicability of the Act to employees is dependent upon the character of their work. In this case we think the Secretary has failed to carry his burden of proof in two respects. First, he failed to show that any of the cardboard or waste paper sold by Modern to Bohager & Sons actually found its way into interstate commerce. No evidence was presented to explain what that purchaser did with salvaged material received from Modern. It is not at all clear that material sold by Modern was *ever* resold to New Haven Board and Carton Company. Certainly, we cannot assume that critical fact. Second, the Secretary failed to show that any of the use-plaintiffs ever collected the salvaged cardboard and waste paper or made delivery thereof to Bohager & Sons. Proof of employment of the use-plaintiffs in the production of goods for commerce was clearly absent.

(c) *Were Their Employments "Closely Related" and "Directly Essential" to the Production of Goods for Commerce?*

Whether the use-plaintiffs in these suits were "engaged in any closely related process or occupation directly essential to the production of goods for commerce"

is the principal issue in this case. Relying upon testimony describing inconveniences and possible work stoppages anticipated by six of Modern's customers if trash removal service were not available on a regular basis, the District Court found that the use-plaintiffs were engaged in work "closely related" and "directly essential" to the production of goods for commerce and held them within the coverage of the Act. Consideration of the facts of record in the light of cases interpreting the language of the Act convinces us that the trial judge erred in this holding and that the coverage of the Act should not be extended to include these employees.

Basic to consideration and determination of this phase of the present case are three decisions in which the Supreme Court applied the language of section 3(j) of the Act [10] prior to its amendment in 1949: Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638 (1942); Borden Co. v. Borella, 325 U.S. 679, 65 S.Ct. 1223, 89 L. Ed. 1865 (1945); and 10 East 40th St. Co. v. Callus, 325 U.S. 578, 65 S.Ct. 1227, 89 L.Ed. 1806 (1945). In Kirschbaum the meaning of the phrase "necessary to the production [of goods for commerce]." was examined and it was held that coverage under the Act extended to employees of the owner of a loft building who were engaged in operation and maintenance thereof, where the tenants were principally engaged in the production of clothing for shipment in interstate commerce. The Court reasoned that, although the owner was in no way affiliated with the tenants and did not produce goods for commerce, the "work of the employees * * * had such a close and immediate tie with the process of production for commerce, and

10. 29 U.S.C.A. § 203(j); as revised in 1949 the section reads as set forth in footnote 8, supra. Only the last clause was amended in 1949. Before the amendment it was provided that "an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any

other manner working on such goods, *or in any process or occupation necessary to the production thereof*, in any State." 52 Stat. 1061. (Emphasis added.) The amended last clause provides: *"or in any closely related process or occupation directly essential to the production thereof*, in any State." 63 Stat. 911. (Emphasis added.)

was therefore so much an essential part of it * * *" that the employees' occupations were "necessary" to such production. In the Borden Co. case a similar conclusion was reached in holding the Act applicable to porters, elevator operators and night watchmen employed in the New York City office building owned by Borden Company, an interstate producer of food products, and largely tenanted by that company's central offices, even though no production facilities were located in the building. The extensive and detailed supervision, management and control of operations maintained by executives and administrators located in the building were found to be just as essential to the productive activity of Borden's scattered operating facilities as the direct physical labor performed in the loft in Kirschbaum. Since the employees engaged in maintenance and operation of Borden's office building stood in the same relationship to this "production" as did those in Kirschbaum, the Court held their occupations were "necessary" to production for commerce and covered by the Act. In the Callus case,* however, a different result was reached, even though the employees of the building performed the same tasks as those involved in the Kirschbaum and Borden Co. cases. In Callus the space in a 48-story New York office building was held out for general tenancy and was leased to over one hundred tenants engaged in a great variety of enterprises. Although a substantial portion of the tenants was shown to be engaged in the production of goods for interstate commerce (at remote locations, as in Borden Co.), the Court concluded:

> "Renting office space in a building exclusively set aside for an unrestricted variety of office work spontaneously satisfies the common understanding of what is local business and makes the employees of such a building engaged in local business. Mere separation of an occupation from the physical process of produc-

tion does not preclude application of the Fair Labor Standards Act. But remoteness of a particular occupation from the physical process is a relevant factor in drawing the line. Running an office building as an entirely independent enterprise is too many steps removed from the physical process of the production of goods. Such remoteness is insulated from the Fair Labor Standards Act by those considerations pertinent to the federal system which led Congress not to sweep predominantly local situations within the confines of the Act." 325 U.S. at 583, 65 S. Ct. at 1229, 89 L.Ed. 1806.

Discussing the line drawn between Callus on the one hand and Kirschbaum and Borden Co. on the other, in a recent opinion, Mitchell v. H. B. Zachry Co., 362 U.S. 310, 315, 80 S.Ct. 739, 743, 4 L.Ed. 2d 753 (1960), the Court said:

> "* * * Regardful of the governing principle that coverage turns upon the nature of the employees' duties, and not upon the nature, local or interstate, of the employer's general business, we held the case [Callus] distinguishable from Borden and Kirschbaum because the employment, since part of an enterprise which 'spontaneously satisfies the common understanding of what is local business,' was itself sufficiently different, despite identical employee duties, from prior cases to justify regarding it as separate from the 'necessary parts of a commercial process' which are within the Act. These decisions and distinctions were not exercises in lexicography. No niceties in phrasing or formula of words could do service for judgment, could dispense with painstaking appraisal of all the variant elements in the different situations presented by successive cases in light of the purpose of Congress to limit coverage short of the exer-

---

* Cited and followed by this court in Thomason v. Alester G. Furman Company, 222 F.2d 421 (4th Cir. 1955).

cise by it of its full power under the Commerce Clause."

In 1949 the last clause of section 3(j), now 29 U.S.C.A. § 203(j), was amended by substituting the words "directly essential" for the word "necessary" and by adding the requirement that the employment be "closely related" to production (see footnote 10, supra). Although the legislative history of the amendment indicates some disagreement as to the degree of the change, it is apparent that some restraint on coverage was intended by both the House and the Senate. See discussion in Mitchell v. H. B. Zachry Co., 362 U.S. 310, 317, 80 S.Ct. 739, 4 L. Ed.2d 753 (1960). The Court in the last above cited case pointed out that, at least in the peripheral category of activity which is merely "related" to production for commerce, Congress expressly reemphasized its purpose to avoid intrusion into withdrawn local activities.

As the excerpts from the legislative history quoted in the District Court's opinion (207 F.Supp. at 602–603) demonstrate, both the House and Senate Reports stated that the 1949 changes were not intended to remove maintenance, custodial and clerical employees from the coverage of the Act, since "the work of such employees, is, *as a rule*, closely related and directly essential to production whether they are employed by the producer of goods or by someone else who has undertaken the performance of particular tasks for the producer." (Senate Report, 95 Cong.Rec. 14875; emphasis supplied.) This statement clearly endorses the continuation of coverage for such employees as those in Kirschbaum and Borden Co., but it does not say that employees doing such work will be covered in all cases.

With the legislative history and judicial evaluation of the Act and its 1949 amendments before us, we find the Secretary's citation of types of employment activity which fall within or without the coverage of the Act singularly unpersuasive. So far as can be determined, the holdings in Kirschbaum, Borden Co. and Callus reflect existing law based on their respective fact situations. Moreover, in applying the Act to those employed in activities merely "related" to production for commerce, a conservative view has persisted and requires independent consideration of each situation to determine the character of the relationship between the employee's activity and interstate commerce. Thus, merely listing occupations as covered or exempt under the Act can provide little guidance. Porters, for instance, can fall on either side of the line.

Careful examination of the cases convinces us that two factors, among others, which are vital in holding an employee's employment within the coverage of the Act, are the degree of "remoteness" of his activities from production for commerce and the presence or absence of a "dedication" to production for commerce. In short, for coverage to extend to an employee his activity cannot be too remote from production for commerce and it cannot completely lack dedication to production for commerce.

These criteria can best be illustrated by reference to cases. In Kirschbaum and Borden Co., the buildings were "dedicated" to the production of goods for commerce where there was a lasting dominant relationship between the activities for which the building was used and production for commerce. In Callus, on the other hand, it was the absence of any such relation to interstate commerce which removed the employment from the coverage of the Act. Any connection with commerce in Callus was purely fortuitous and subject to change; hence, the Court refused to consider what percentage of the tenants were producing for commerce. The physical activities of the three groups of employees were similar, as were the contacts with tenants; and in Borden Co. and Callus the employments were equally "remote" from production for commerce because equally separated from the physical process of production.

In Mitchell v. H. B. Zachry Co., 362 U.S. 310, 80 S.Ct. 739, 4 L.Ed.2d 753 (1960), the Court held that employment

in construction of a dam for the sole purpose of impounding a reservoir to supply Corpus Christi, Texas, and vicinity was not within the coverage of the Act even though water from the system would be supplied to facilities and instrumentalities of commerce and to industries producing goods for commerce. Replacement or new construction was distinguished from maintenance and repair of the dam after completion on the theory that employment in construction was one step more remote than employment in maintenance and repair. In addition, the Court emphasized that neither the construction nor the operation of the dam was designed for the use of producers for commerce, but was intended instead for a miscellany of users throughout the geographical area of the water district. On the basis of the combination of remoteness of construction from production and the absence of a dedication of the completed facilities either exclusively or primarily to production, the Court found that the activity was not "closely related" or "directly essential" to production for commerce.

The relationship between the employment and production for commerce in the present case is unmistakably similar to that in Callus, especially upon consideration of the factors of dedication and remoteness. The outstanding feature of the employment of the use-plaintiffs is a lack of dedication to production for commerce. Modern's trash removal service is held out on the same terms for the use of anyone in the geographical area served. The character and activity of the customer are so immaterial to Modern's operations that Modern's employees are generally uninformed and unconcerned about the customers they serve. The sole problem confronting the drivers is how to remove the trash with dispatch and how frequently to return for more. If any of Modern's customers produces goods for shipment in interstate commerce, the relationship of the employee serving that customer to such production for commerce is purely fortuitous and is subject to change, just as it was in Callus.

The purpose of Modern's activity is to serve a miscellany of users in a limited geographical area and, as was true of the water supply system in Mitchell v. H. B. Zachry Co., there is no dedication to production for commerce.

The trash removal activity revealed by this record "spontaneously satisfies the *common understanding* of what is local business" and the employees of such an employer are engaged in local business. The generally accepted view of trash removal as a local service, carried on in a limited geographical area for the benefit of all local residents, fully supports this statement. It would stretch understanding too far to hold that the trash collector is engaged in "producing" all the goods and services offered by his varied customers, even under the broad terms of section 3(j) of the Act (see footnote 8, supra).

Moreover, the trash removal service provided to Modern's customers by the use-plaintiffs is more remote than the work of a porter on the premises of a manufacturing operation or in the offices of executives and administrators. The physical contact of Modern's employees with a customer may be no more than two to three minutes a week and that contact is outside of or at the periphery of the customer's operating area. How different is the "outside" work of a trashman from a porter's intimate and regular contact *inside* the premises! We find here both a remoteness from production for commerce and the absence of a dedication, either exclusively or primarily, to production for commerce which lead us to the conclusion that the activity of the use-plaintiffs is not "closely related" or "directly essential" to production for commerce.

We reach the above conclusion, as did the Court in Callus, without consideration of the quantitative evidence regarding the amount of customer activity which is or was in production for commerce or "in commerce." However, as noted above, the Secretary presented direct proof of only four customers which shipped goods in interstate commerce.

In all, less than forty of the 800 to 1,000 customers served by Modern during the period represented by the proof were even identified by name in interrogatories and testimony. No evidence in this record indicates that a large proportion of Modern's business was related to production for commerce. The stipulation agreed to by Modern is the sole item tying the activities of the use-plaintiffs to customers engaged in the production of goods for commerce and it establishes such a contact for no more than a few minutes each week. Especially in this third category where employer activity is only "related" to production for commerce, we think proof of a more substantial contact with and effect on commerce than is here demonstrated is required to bring employees within the coverage of the Act. Congress has most strongly indicated its desire to limit displacement of state power in this area (Mitchell v. H. B. Zachry Co., 362 U.S. 310, 316, 80 S.Ct. 739, 4 L.Ed.2d 753 (1960)) and, therefore, courts must insist upon adequate proof to justify the extension of coverage.

The Secretary cites Mitchell v. Dooley Bros., Inc., 286 F.2d 40 (1st Cir. 1960), cert. denied, 366 U.S. 911, 81 S.Ct. 1086, 6 L.Ed.2d 236 (1961), as reaching a decision favorable to his view on facts similar to the present case. In that case the Secretary of Labor sought an injunction to restrain Dooley Bros., Inc., a local trash collector in and around Boston, Massachusetts, from violating the Act, where each of six employees spent one fourth to one third of every working day in making collections from customers engaged in production of goods for interstate commerce. The District Court, in its opinion at 181 F.Supp. 312 (D.Mass.

1960), granted the company's motion for summary judgment and the Court of Appeals reversed on the ground that the employment was both "directly essential" and "closely related" to production for commerce. Since the District Court apparently had found the employment "directly essential," the decision of the Court of Appeals discussed only the issue of remoteness and found error in the view of the District Court that the 1949 amendment of section 3(j) of the Act had changed the law to exclude the employees there involved from coverage. It is noteworthy that the Callus decision was not mentioned in either the opinion of the District Court or the Court of Appeals and that there was no discussion of "dedication," the significant factor so recently emphasized by the Supreme Court in Mitchell v. H. B. Zachry Co., supra. With the limited knowledge of the facts available to us, it is impossible to determine whether or not the Dooley Bros. opinion is consistent with this one. However, as the different results reached simultaneously in Borden Co. and Callus so dramatically illustrate, it is a fundamental principle that each of these cases must be considered on its own special facts. Thus, we do not consider the result in Dooley Bros. persuasive here.

### III

### IS MODERN EXEMPT AS A "RETAIL OR SERVICE ESTABLISHMENT"?

Even assuming, *arguendo,* that the activities of the use-plaintiffs bring them within the coverage of the Act, an independent alternative ground for the holding that Modern's employees are not subject to the provisions of the Act is afforded by the exemption under section 13(a) (2) of the Act.[11] The 1949 revi-

---

11. 29 U.S.C.A. § 213(a) (2), as revised by amendment in 1949, provided as follows:

"§ 213. Exemptions

"(a) The provisions of sections 206 and 207 of this title shall not apply with respect to * * * (2) any employee employed by any retail or service establishment, more than 50 per centum

of which establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located. A 'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales

sion of that section specified three tests which must be met by an establishment seeking to qualify for the exemption: (1) Fifty percent of its annual dollar volume of sales of goods or services must be made within the state; (2) seventy-five percent of its total sales volume must *not* be for resale; (3) seventy-five percent of its total sales volume must be recognized as retail sales or services in the particular industry. It is undisputed that Modern has met the first two of these tests. The question here is whether Modern has carried its burden of proof to satisfy the third.

At the trial Modern introduced the testimony and depositions of three witnesses who were then engaged in the management of unrelated trash removal businesses. Each stated his opinion that the services performed by Modern are retail services and are so regarded by the trash removal industry in general. In support of these views the following characteristics of Modern's business were noted: The service is offered to the entire public; there is no possible resale or re-use of materials collected; the customers are "end users" of the service with no physical possibility for resale of the service; the service is extended in relatively small amounts per customer to many customers; and the service satisfies the everyday needs of the general community.

(a) *Does the Trash Removal Industry Lack a "Retail Concept"?*

It is Modern's contention that the requirements of the third test under section 13(a) (2), as amended in 1949, have been fully satisfied by the un-

contradicted evidence that all of its waste removal services are considered retail in the trash removal industry. The Secretary, however, contends that before such recognition of a business activity as retail sales or services can be established, it must be shown that within the meaning of the Act there exists a so-called "retail concept" in the industry. Secondly, the Secretary argues that Congress never intended to rely solely upon the declarations of persons engaged in business in an industry to establish recognition of an activity as retail sales or services in that industry, since such testimony would have too great a likelihood of being self-serving.

The Secretary presented, as an expert witness, Dr. Robert D. Entenberg, a professor and author of several books in the field of marketing. Dr. Entenberg stated that, in his opinion, Modern's service did not fall within ordinary concepts of retail or wholesale but most closely resembled a utility, and he noted that it was so classified by the Standard Industrial Classification Manual in 1957. However, Dr. Entenberg also gave the opinion that Modern's service had more of the attributes of wholesale than of retail on the grounds that it served a business function to commercial customers and that Modern's service was sold primarily to business rather than private customers. Counsel for Modern here contends that this latter opinion was especially misleading to the trial court because it relied on "business use" as the criterion for a nonretail sale, a test which was expressly repudiated by the 1949 amendment of section 13(a) (2), presently to be explained. Modern

or services in the particular industry; * * *." 63 Stat. 917 (1949). As the District Court noted, the Fair Labor Standards Amendments of 1961, 75 Stat. 65, 71 (1961), became effective just before suit was brought in these cases. However, because Modern's annual gross volume of sales did not amount to $1,000,000 or more and Modern is not engaged in any of the business activities, both as specified by the recent amendment, the section as above quoted is applicable to the instant case.

As originally enacted and prior to its amendment in 1949, the above section provided:

"Sec. 13. (a) The provisions of sections 6 [now 206] and 7 [now 207] shall not apply with respect to * * * (2) any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce; * * *." 52 Stat. 1067 (1938).

claims that Dr. Entenberg's criteria for a "retail or service establishment" were plainly at variance with the Wage and Hour Division's administrative regulations. Modern also points out that Dr. Entenberg frankly admitted that he lacked personal familiarity with the trash removal industry and the opinions of that industry.

The District Court held "as a matter of law" that Modern is not a "retail or service establishment" on the basis of (a) Dr. Entenberg's testimony, (b) the classification of "Refuse Systems" as utilities in the Standard Industrial Classification Manual, and (c) the similarity of the work of Modern's employees to that of porters and maintenance men. Alternatively, the court found as a fact that Modern had "failed to prove that its business had traditionally and before 1949, been commonly recognized as retail," and concluded as a matter of law that it had failed to prove that it is entitled to exemption. Our disagreement with these conclusions is explained in the following discussion.

■ It is well-established that exemptions from the coverage of the Act are to be narrowly construed against the employers seeking to assert them and that, in order to qualify, establishments must be plainly and unmistakably within the terms and spirit of the exemptions. Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed. 2d 393 (1960); Mitchell v. Kentucky Finance Co., 359 U.S. 290, 295, 79 S. Ct. 756, 3 L.Ed.2d 815 (1959); A. H. Phillips Co. v. Walling, 324 U.S. 490, 493, 65 S.Ct. 807, 89 L.Ed. 1095 (1945); Mitchell v. Sherry Corine Corp., 264 F. 2d 831, 835 (4th Cir. 1959), cert. denied, 360 U.S. 934, 79 S.Ct. 1453, 3 L.Ed.2d 1546.

The Secretary relies upon Mitchell v. Kentucky Finance Co., 359 U.S. 290, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959), and several cases following it, in urging that Modern cannot qualify for the exemption sought because it has not shown that its activity fits the "concept" of retail contemplated by section 13(a) (2). In Kentucky Finance the Court denied the exemption to a small loan company even though it was clear (1) that more than fifty percent of its sales were made within the state, (2) none of its sales were for resale, and (3) the activity was recognized in the financial industry as the "retail end" of that industry. It was noted that the 1949 amendment to section 13(a) (2) was made for the specific and particularized purpose of eliminating the Administrator's "business use" test, previously approved by the Court in Roland Electrical Co. v. Walling, 326 U.S. 657, 66 S.Ct. 413, 90 L.Ed. 383 (1946), and substituting more flexible tests therefor. But, the Court said, 359 U.S. at 294–295, 79 S.Ct. at 758–759, 3 L.Ed.2d 815:

"* * * We find nothing in the debates or reports which suggests that Congress intended by the amendment to broaden the fields of business enterprise to which the exemption would apply. Rather, it was time and again made plain that the amendment was intended to change the prior law only by making it possible for business enterprises *otherwise eligible under existing concepts* to achieve exemption even though more than 25 percent of their sales were to other than private individuals for personal consumption, provided those sales were not for resale and were recognized in the field or industry involved as retail. Thus *enterprises in the financial field, none of which had previously been considered to qualify for the exemption* regardless of the class of persons with which they dealt, and regardless of whether they were thought of in the financial industry as engaged in 'retail financing,' remained unaffected by the amendment of § 13(a) (2).

"Any residual doubt on this score is dispelled by the explicit and repeated statements of the sponsors of the amendatory legislation and in the House and Senate Reports to the effect that 'The amendment

does not exempt banks, insurance companies, building and loan associations, *credit companies* [this emphasis supplied by the Court], newspapers, telephone companies, gas and electric utility companies, telegraph companies, etc., *because there is no concept of retail selling or servicing in these industries.* Where it was intended that such businesses have an exemption one was specifically provided by the law \* \* \*.' " (Emphasis added except as noted.)

As the above quoted remarks clearly indicate, there are fields which completely lack a retail concept, such as the financial field, and there are business activities which have been specifically mentioned by Congress as being ineligible for exemption as retail or service establishments. But, it is significant that trash removal is not in either of these categories. Even the rulings of the Administrator have not classified the trash removal industry as ineligible for the exemption for lack of a "retail concept." See 29 C.F.R. § 779.317 (rev. as of Jan. 1, 1963). No case except Mitchell v. Dooley Bros., Inc., supra, 286 F.2d 40 (1st Cir. 1960), has considered application of the Act to employees in the trash removal industry. Since the two opinions written in that case failed to discuss the possibility of exemption under section 13 (a) (2), it may be that such a possibility was not considered in Dooley Bros.

In the absence of any prior determination classifying trash removal as within or outside the traditional retail concept, we are urged to consider Modern's activities analogous to those of other types of establishments considered ineligible for exemption in cases and in administrative regulations such as 29 C.F.R. § 779.317. The suggested approach was followed in Goldberg v. Sorvas, 294 F. 2d 841 (3d Cir. 1961), where the court decided that a "shopping service," whose employees posed as customers and evaluated the efficiency of clerks in retail establishments for the managements thereof, could not be a "retail or service establishment" because its service was similar to that of several types of establishments long considered by the Administrator as ordinarily lacking in retail characteristics and because the service, a specialized one which the public had no occasion to use, had never been recognized as a retail service. The Secretary also contends that Modern's business is closely analogous to that of supplying janitorial services for offices and industrial establishments, a business recently held to be outside the "retail concept" in Goldberg v. Saf-T-Clean, Inc., 209 F. Supp. 343 (S.D.Fla.1962), and Goldberg v. Eagle Maintenance & Supply Co., 197 F.Supp. 27 (S.D.Cal.1961).

We agree that close and persuasive comparisons existed in Goldberg v. Sorvas, supra, especially where the service offered had utility *only* to businessmen, and we note that the employees there involved, on occasion, crossed state lines to render the service. However, in none of the types of establishments called to our attention do we find such similar characteristics as would compel us to hold that an establishment offering and performing trash removal services in the manner shown by this record is beyond the "retail concept."

In determining whether or not a business activity is a "retail or service establishment" within the meaning of the section 13(a) (2) exemption, we think the most satisfactory approach is to examine the facts of record as to the nature and conduct of its business in the light of general criteria developed under the Act since its enactment in 1938. Of course, the "business use" rule, that sales to other than individual consumers to satisfy their personal wants could not qualify as retail, can no longer be used for such determinations. Although neither binding on the courts nor equally useful in all cases, the current regulations published by the Secretary provide some guidelines, several of which we find pertinent in making an examination of the present record. See 29 C.F.R. (rev. as of Jan. 1, 1963). The general character-

istics of retail and service establishments are described in § 779.318 as follows:

"Typically a retail or service establishment is one which sells goods or services to the general public. It serves the everyday needs of the community in which it is located. The retail or service establishment performs a function in the business organization of the nation which is at the very end of the stream of distribution, disposing in small quantities of the products and skills of such organization and does not take part in the manufacturing process. * * * Such an establishment sells to the general public its food and drink. * * * It provides the general public its repair services and other services for the comfort and convenience of such public in the course of its daily living."

Some of the usual distinctions between wholesale and retail activities are set forth in § 779.327 in these words:

"(a) The distinction between a retail sale and a wholesale is one of fact. Typically, retail sales are made to the general consuming public. The sales are numerous and involve small quantities of goods or services. Wholesale establishments usually exclude the general consuming public as a matter of established business policy and confine their sales to other wholesalers, retailers, and industrial or business purchasers in quantities greater than are normally sold to the general consuming public at retail."

\* \* \* \* \* \*

"(b) The sale of goods or services in a quantity approximating the quantity involved in a normal wholesale transaction and as to which a special discount from the normal retail price is given, is generally regarded as a wholesale sale in most industries."

Evaluation of the facts of record clearly indicates to us that Modern's business fits the above-mentioned and other important criteria for classification as a retail or service establishment. Its sales are numerous and relatively small amounts of service are rendered at each stop. The service is offered to the general public in a limited geographical area at uniform rates with no discounts of the wholesale type. There is no requirement that customers utilize Modern's service regularly or in any minimum quantity and there is no requirement that the customer have status as a manufacturer, retailer or other commercial ·entity. The removal and final disposal of waste ministers to the everyday needs of the customers and is a clear manifestation of the "end of the stream of distribution." Moreover, one can hardly conceive of a field of endeavor where a more local and independent business is likely to spring up or is more typical. Any man with no more than a truck, physical vigor and enterprise can still solicit customers, collect and dispose of trash in many communities. It would indeed be remarkable if his hired helpers were to be brought within the Secretary's complex and confining regulations merely because a portion of the customers served were found to be engaged in production for commerce. Although it is not specified in the legislative history as a typical retail business, we feel that trash removal as carried out by Modern readily qualifies for that classification. Taking a very practical view, which is said to be the proper criterion in these cases, would seem to point to the conclusion that Modern's activity fits the concept of retail contemplated by section 13(a) (2) of the Act.

(b) *Did Modern Prove Recognition of its Activity as Retail in the Industry?*

The Secretary argues that the court cannot rely on statements of persons in business within the industry to show that Modern's activity is recognized as retail in the trash removal industry. However, it is clear that each of the three witnesses offered by Modern was well-qualified to state both his personal

opinion and the general opinion of persons in the industry as to what was recognized as a retail service in the industry. In contrast, Dr. Entenberg, the Secretary's only witness on this point, made it abundantly clear that he was not familiar with the trash removal industry, its methods of operation, or the opinions of its practitioners. Although some legislators, in discussing the 1949 amendment to section 13(a) (2), expressed concern that the amendment would permit each industry to decide for itself whether or not its sales were retail,[12] it was pointed out that the only proper background for defining a retail or service establishment in a particular industry is the understanding of the people dealing in that industry as to what constitutes retail services or retail sales.[13] Final determination, of course, was left to the Administrator and to the courts.

In the present case, not only does the testimony of members of the industry support Modern's claim to being a retail or service establishment, but so also do many of the general criteria set forth by the Department of Labor in its administrative regulations. A practical view of the physical facts of record clearly indicates that Modern is engaged in a local business offering services to "ultimate" consumers. Dr. Entenberg's judgment as to whether Modern's service is retail or wholesale, while properly authoritative in his academic field, fails to affect the issue before us because it was based upon the "business use" test [14] which can no longer be used in considering exemptions under section 13(a) (2).

We, therefore, hold that, even if its employees were held to be within the coverage of the Act, Modern has satisfied its burden of proof in showing it is a "retail or service establishment" entitled to exemption from the provisions of the Act under section 13(a) (2).

## IV

## ADDITIONAL ISSUES

As we conclude that the use-plaintiffs cannot recover the compensation awards made at the direction of the District Court, we find it unnecessary to decide whether that court erred in failing to allow interest on the awards.

Modern has also contended that the Secretary lacked power to bring the wage suits under 29 U.S.C.A. § 216(c) on the ground that several of the issues of law involved had not been settled by the courts. Although the principles controlling decisions as to coverage and exemptions under the Act are elusive and difficult to apply, this case differs from Wirtz v. Highway Transportation, Inc., 310 F.2d 643 (4th Cir. 1962), in that

---

12. Remarks of Senator Aiken, 95 Cong. Rec. 12510, 12519.

13. Remarks of Senator Holland, 95 Cong. Rec. 12501, 12510, 12519.

14. Dr. Entenberg clearly stated that the criterion he was using to determine whether a sale was retail or wholesale was "the purpose for which the service or good is bought determines the classification." He elaborated on this statement, "if the purpose of the sale is for personal consumption and use, it is a retail sale regardless of the quantity involved, and if the service sale or the sale of a good is for the purpose of furthering production or for resale, or to improve the operating efficiency, or it is necessary in the conduct of a business, this is automatically a wholesale sale." We find it interesting to compare these definitions with those of Dr. Theodore N. Beck-man, co-author with Maynard and Engle of marketing textbooks which were identified by Dr. Entenberg as stating the accepted definitions of retail and wholesale. Dr. Beckman's definitions were among those quoted in Roland Electrical Co. v. Walling, 326 U.S. 657, 674 [66 S.Ct. 413, 90 L.Ed. 383] (1946), in support of the "business use" test:

"'Wholesaling includes all marketing transactions in which the purchaser is actuated solely by a profit or business motive in making the purchase.

"'Retailing includes all marketing transactions in which the purchaser is actuated solely by a desire to satisfy his own personal wants or those of his family or friends through the personal use of the commodity or service purchased.' (Beckman and Engle in Wholesaling Principles and Practice (1937) p. 25)."

the legal principles here have been established within the meaning of the prohibition against test suits in 29 U.S. C.A. § 216(c), (see footnote 3, supra). Actions commenced by the Secretary to enforce the provisions of the Act cannot be barred on the sole ground that application of the law to the facts is difficult and onerous.

For the reasons stated, we conclude that the injunction was properly denied and that the use-plaintiffs were not entitled to recover. The cases will be remanded with direction to enter appropriate orders consistent with the views herein expressed.

Affirmed in part, reversed in part and remanded with directions.