W. Willard **WIRTZ**, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

**SHERMAN ENTERPRISES, INC.,** Defendant.

Civ. A. Nos. 13822–14342.

United States District Court
D. Maryland.

May 14, 1964.

Marshall H. Harris, Deputy Regional Atty., U. S. Dept. of Labor, Charles Donohue, Sol., and Ernest N. Votaw, Regional Atty., U. S. Dept. of Labor, Chambersburg, for plaintiff.

Lawrence T. Zimmerman, Washington, D. C., Earle K. Shawe, Baltimore, Md., for defendant.

WINTER, District Judge:

Plaintiff sues, pursuant to the provisions of the Fair Labor Standards Act, 29 U.S.C.A. §§ 201 et seq. to recover unpaid overtime compensation allegedly due under 29 U.S.C.A. § 207. As presented for decision, the controversy involves the question of coverage under the Act of four employees of the defendant during the period of the work weeks ending May

28, 1960 to August 25, 1961.[1] The parties have entered into stipulations concerning the hours worked, travel time, amounts paid by the defendant, and amounts claimed by the plaintiff, for each of Alphonse Polselli, Thomas Polselli, Robert J. Kittell, and Thomas L. Simon, so that the parties may agree as to the amount of the judgment to which plaintiff is entitled to the extent, if any, that coverage is found.

Defendant, a Massachusetts corporation having offices and a shop in Gambrills, Maryland, is engaged in the lease or sale of automatic pinsetting equipment for bowling alleys in various states of the Eastern United States. New equipment is manufactured for defendant by Crompton-Knowles Corporation, an unaffiliated corporation, situated in Worcester, Massachusetts. Repossessed equipment is reconditioned and rebuilt by defendant at its shop at Gambrills, Maryland. Defendant distributes two types of machines—"rubber duck," which is distributed exclusively to bowling alleys in Pennsylvania, and "hard duck," which is distributed elsewhere throughout the Eastern United States.

During the period in suit, defendant's salesmen solicited business throughout the East from Vermont to Georgia. Machines were sold absolutely, or on an installment sales contract, or leased under a lease containing an option to purchase. An essential part of every sale or lease was an undertaking by defendant to install the equipment on the customer's premises and, as part of such installation, to maintain its personnel on the premises for a period after installation to adjust the equipment and put it in good working order, to train the customer's employees how to maintain and make minor adjustments to the equipment, and to replace defective parts for a period of six months after installation.

When defendant's salesmen procured a customer whose credit was approved, defendant notified Crompton-Knowles, and the latter made shipments of the component parts of the pinsetting equipment directly to the customer. Shipment was usually made by common carrier. Defendant then dispatched a traveling installation crew to the customer's premises, together with the tools necessary to install, adjust and service the machines. During the relevant period the volume of defendant's business was so great that its installation crews were almost constantly either at a job site or traveling to one.

The installation crews normally consisted of ten men, one of whom was the crew chief. Each crew chief would communicate with the defendant's work manager at the Gambrills, Maryland office to ascertain the location of a job site. The work chief would then direct the crew to report to a certain customer's bowling alley at a designated time. Although not strictly required to do so, the members of a crew traveled to a job site in two station wagons owned by the defendant. While traveling, each member would receive an allowance of $1.00 for each forty miles traveled and, in addition, would receive a per diem of $7.50 for subsistence if the job site was more than a given distance from Gambrills, Maryland, the distance being approximately the distance required to travel outside the State of Maryland. A crew member could elect to travel in his own vehicle, but he would not be paid the $1.00 per forty miles' allowance unless he carried other employees as passengers. In addition to the two station wagons used by the installation crew for transportation, defendant supplied two panel trucks to carry power and hand tools necessary for the installation of the pinsetting equipment. Upon arrival at a job

---

1. As originally filed, eight employees were concerned. At trial the Secretary dismissed his case as to two employees and, after trial, the defendant has conceded coverage as to two other employees.

It should be noted that the period in question was prior to the effective date of the 1961 amendments to the Fair Labor Standards Act.

site it was one of the duties of the crew to unload these panel trucks.

During the portion of the period in question that each was an employee of the defendant, Alphonse Polselli, Thomas Polselli and Robert Kittell were members of the same "hard duck" crew, and Alphonse Polselli was the crew chief. Thomas Simon was a member of a "hard duck" crew for approximately seven weeks; for two weeks he was engaged at the Gambrills, Maryland shop reconditioning and rebuilding repossessed machines; and the remainder of his period of employment he was engaged in the servicing of "rubber duck" machines in Pennsylvania. Because his duties at Gambrills, Maryland, and in servicing "rubber duck" equipment, present somewhat different factual aspects, they will be considered separately hereafter.

When a "hard duck" installation crew arrived at a job site the crew chief would communicate with the common carrier and arrange for the delivery of the machine components to the customer's bowling alley. The number of trucks used by the common carrier depended on the size of the customer's premises, since each alley required the component parts for one complete machine. Although the size varied, the average installation was sixteen machines at a given site. The components of sixteen machines would require two trucks. The components for each machine were packed in fifteen to twenty cartons, and the weight of these cartons would range from ten to seven hundred fifty pounds. When the carrier's vehicles arrived at the customer's premises, the members of the crew would unload the vehicles by removing the cartons from the truck and placing them in appropriate positions on the alleys in the customer's establishment. Unloading took between two-and-a-half and four hours. Casual labor was sometimes employed to unload such vehicles, but the use of casual labor was the exception, rather than the rule. When the truck was unloaded and the components of the machines unpacked, the crew would proceed to assemble and install the equipment. While not determinative of any issue in this case, and although sharply disputed, I find that during the period in question initial installation consumed approximately eight to ten hours per machine. Installation was followed by testing and the making of required adjustments, and then the installation crew would immediately depart to the next job site, leaving one member behind for approximately two weeks to continue to make adjustments as needed during actual use of the equipment by the customer's patrons and to train the customer's maintenance personnel.

During the period in suit there were 643 installations of new equipment, and 140 installations of reconditioned and rebuilt machines. The reconditioned and rebuilt machines had been obtained by repossession. When defendant repossessed equipment, the installation crews would travel to the customer's alley and perform the manual function of disassembling and removing the machines. The components of the machines would be sent to the Gambrills, Maryland shop where they would be rebuilt and reconditioned and then stored in a warehouse in Maryland. When resold defendant would ship the components of these machines directly to the customer and the installation crew would perform the same functions as with totally new equipment.

Each member of the installation crew was required to keep certain records, in addition to his other duties. He kept personal time and travel records and was paid $1.00 per week for this function, which consumed approximately one hour. Each week the crew chief would collect these records from the crew, check their accuracy against records which he kept relating to each member of the crew, and send the crew's records to the Gambrills, Maryland office, which, in turn, issued appropriate checks in payment of the amounts shown to be due.

During the time that Thomas Simon performed duties in reference to "rubber duck" machines, he was required to deal with pinsetting machines of greater complexity. These, consisting of more parts

than the "hard duck" machines, were subject to more frequent breakdowns. Mr. Simon's principal functions were to replace defective parts after the installation and during actual operation by the customers, and to train the customer's mechanics. Indicative of the greater servicing required by "rubber duck" equipment, Mr. Simon on one occasion was required to remain at the premises of one customer for approximately one thousand hours. Mr. Simon, too, kept personal time and travel records, and he was required to prepare service forms supplied by the Gambrills, Maryland office for each machine which he serviced. His personal records and service forms were collected by his supervisor and, presumably, forwarded to the Gambrills, Maryland office.

Plaintiff advances four theories of coverage. They are that: (1) the employees regularly engaged in traveling across state lines in the performance of their duties as members of an installation crew are covered by the Act, (2) the preparation of time, subsistence and service reports is covered by the Act, (3) loading and unloading of components of pinsetting machines and tools to install or disassemble pinsetting machines, when the same have been shipped in interstate commerce, are so closely related to interstate commerce as to be covered by the Act, and (4) employees while engaged in the installation and servicing of equipment received from an interstate shipment in the performance of a contract which requires the assembling and installation of pinsetting machines which have been shipped in interstate commerce, are covered by the Act. Essentially, all of these contentions stem from the assertion that, in the various respects stated, the employees are "engaged in commerce" or, alternatively, "engaged * * * in the production of goods for commerce," as those terms are used in §§ 6 and 7 of the Act, 29 U.S.C.A. §§ 206 and 207.[2]

At the outset it should be noted that any determination of whether an employee is engaged in commerce or engaged in the production of goods for commerce depends upon the activities of that employee, and not upon the over-all or general business of his employer, Mitchell v. Lublin, McGaughy & Asso., 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959); Mitchell v. C. W. Vollmer & Co., 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196 (1955); Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943); Wirtz v. Modern Trashmoval, Inc., 323 F.2d 451 (4 Cir. 1963), cert. den. 84 S.Ct. 1222, 12 L.Ed.2d 216 (1964); Crook v. Bryant, 265 F.2d 541 (4 Cir. 1959); Goldberg v. Harrell, 206 F.Supp. 71 (D.C.Md.1962). From a study of the evidence and examination of the authorities cited by both parties, the Court concludes, as hereafter more specifically indicated, that plaintiff should prevail, in that the activities of three of the employees are covered in their entirety by the provisions of the Act, and the activities of Mr. Simon are covered in part. This conclusion is reached on the basis of three of the grounds which the plaintiff advances. The three grounds on which coverage is found are as follows:

(1) "Commerce" is defined by § 3 of the Act, 29 U.S.C.A. § 203(b), as "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." Employees who are required to travel across

---

**2.** "§ 206. Minimum wages; effective date
    (a) Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the following rates—
* * .* "
   "§ 207. Maximum hours
    (a) Except as otherwise provided in this section, no employer shall employ any of his employees who is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed. * * * "

state lines and who are regularly engaged in traveling across state lines as an essential part of the performance of their duties are engaged in commerce; Mitchell v. Kroger Company, 248 F.2d 935 (8 Cir. 1957). See also, Mitchell v. Lublin, McGaughy & Asso., supra; Goldberg v. Sorvas, 294 F.2d 841 (3 Cir. 1961); 29 C.F.R., § 776.12 (1963). It is concluded, therefore, that coverage exists with respect to Messrs. Alphonse and Thomas Polselli and Kittell with regard to all of their activities, and that there is coverage with respect to Mr. Simon during the period that he was a member of an installation crew. As to these activities, the conclusion is inescapable that traveling from state to state was required and was an essential part of the duties of each member of an installation crew. On this theory there is not additional coverage with respect to Mr. Simon because his traveling, while he worked on "rubber duck" machines, was confined to the State of Pennsylvania.

(2) The members of an installation crew were required to load and unload interstate shipments of tools and components of pinsetting equipment. The components were still in the channels of interstate commerce at the time of the unloading, and had entered the channels of interstate commerce at the time of loading by Crompton-Knowles. The component parts of repossessed machines which were being returned to Gambrills, Maryland for reconditioning entered the channels of interstate commerce when the machines were disassembled and the components loaded for shipment. When reconditioned machines were resold, the components were in the same posture as components of new machines shipped by Crompton-Knowles. Tools, when sent from state to state, are in the channels of interstate commerce the same as components of new machines. Activities of this nature are sufficient to render the person engaged therein in interstate commerce and within coverage of the Act, Walling v. Jacksonville Paper Co., supra; McComb v. Herlihy, 161 F. 2d 568 (4 Cir. 1947); Goldberg v. Harrell, supra. These activities of the several employees on whose behalf suit is brought, being unsegregated from their other activities, are sufficient to extend the coverage of the Act to Messrs. Alphonse and Thomas Polselli and Kittell, and also to Mr. Simon during the period that he was a member of an installation crew. Coverage on this theory does not extend to the other activities of Mr. Simon. Although it could be claimed that if he unloaded replacement parts, when in Pennsylvania working on "rubber duck" machines, Mr. Simon was engaged in interstate commerce, the record discloses that his activities in this regard were *de minimis* and not sufficient to entitle him to coverage under the Act, Crook v. Bryant, supra.

(3) Plaintiff's fourth theory of coverage is that the pinsetting equipment was still "in commerce" while the crew members were installing the machines in the customer's bowling alleys. Because the machines were sold as installed, complete functioning units, the "practical continuity of movement of the goods" continued until they were unloaded and installed in the customer's premises, Walling v. Jacksonville Paper Co., supra (317 U.S. p. 568, 63 S.Ct. p. 335). Because of the complexities of the machines and the defendant's obligations under the various instruments by which it sold or leased the machines, it cannot be said that the interstate movement ended when the components of the machines were removed from the trucks or placed upon the customer's premises prior to installation. In short, the "contract or understanding pursuant to which goods are ordered * * * indicates where it was intended that the interstate movement should terminate," Walling v. Jacksonville Paper Co., supra (317 U.S. p. 569, 63 S.Ct. p. 336), and in this case that intention was clearly when installation of the machines was completed. The crew members were "engaged in commerce" during the installation of the machines since, manifestly, this work was "so directly and vitally related to the functioning of an instrumentality or facility of interstate

commerce as to be, in practical effect, a part of it, rather than isolated, local activity," Mitchell v. C. W. Vollmer & Co., 349 U.S. 427, 429, 75 S.Ct. 860, 862 (1955); Mitchell v. Lublin, McGaughy & Asso., supra; Wirtz v. Modern Trashmoval, Inc., supra (323 F.2d p. 457). See also, Brown v. Minngas Co., 51 F. Supp. 363 (D.C.Minn.S.D.1943). While Mr. Simon was a member of an installation crew he was thus covered by the Act, as were Messrs. Alphonse and Thomas Polselli and Kittell.

■ Under this theory, Mr. Simon was not "engaged in commerce" while in Pennsylvania working on "rubber duck" machines. His activities did not begin until installation of the pinsetting equipment was completed and, as previously indicated, it was at that point that the interstate transportation of the machines and their components ceased, Wirtz v. Modern Trashmoval, Inc., supra.

■ Mr. Simon was covered by the Act for the two week period that he was engaged in reconditioning and rebuilding repossessed machines at the Gambrills, Maryland shop. The record is clear that repossessed machines, after being serviced at Gambrills, Maryland, were sold to various customers throughout the eastern portion of the United States in the same manner as were new machines manufactured by Crompton-Knowles Corporation. Thus, for this period of time Mr. Simon was "engaged in the production of goods for commerce" in the same manner as the two employees as to whom, after trial, defendant has conceded coverage.

■ The remaining theory advanced by the plaintiff admits of some doubt. The cases seem clear that the mere use of the mails in sending reports across state lines is not necessarily engaging in commerce within the meaning

of the Act. Rather, it is only where the interstate communication is a material part of an interstate business that such activity constitutes engaging in commerce and renders the person performing it subject to coverage under the Act, Mitchell v. Lublin, McGaughy & Associates, 250 F.2d 253 (4 Cir. 1957), reversed on other grounds, 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959). Cf. Donovan v. Shell Oil Co., 168 F.2d 229 (4 Cir. 1948). The test of coverage is whether the activity is so directly and vitally related to interstate commerce as to be a part of it, Mitchell v. Lublin, McGaughy & Asso., 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959); McLeod v. Threlkeld, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538 (1943); Wirtz v. Modern Trashmoval, Inc., supra.

■ In regard to Messrs. Alphonse and Thomas Polselli and Kittell, coverage has been found, and how their record-keeping activities should be classified with regard to coverage or noncoverage is academic. As to Mr. Simon, it has been concluded that he was not engaged in commerce when he was servicing "rubber duck" machines and, hence, the preparation and mailing of service reports for that activity, as well as reports of the time which he spent on that activity, have no direct and vital relation to interstate commerce.

■ The remaining question to be decided is whether, in computing the amount of overtime compensation to which the employees for whom plaintiff has sued are entitled, the time spent in traveling from one job site to another should be included. Defendant relies upon § 4 of the Portal-to-Portal Pay Act, 29 U.S.C.A. § 254, the pertinent provisions of which are set forth below, to exclude travel time from the computation.[3]

---

3. "§ 254. Relief from certain future claims under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, and the Bacon-Davis Act

(a) Except as provided in subsection (b) of this section, no employer shall be subject to any liability or punishment under the Fair Labor Standard Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account

This section of the Portal-to-Portal Pay Act was the subject of consideration in Steiner v. Mitchell, 350 U.S. 247, p. 255, 76 S.Ct. 330, p. 335, 100 L.Ed. 267 (1956), where significantly, the Court said:

"On the whole it is clear, we think, that while Congress intended to outlaw claims prior to 1947 for wages based on all employee activities unless provided for by contract or custom of the industry, including, of course, activities performed before or after regular hours of work, *it did not intend to deprive employees of the benefits of the Fair Labor Standards Act where they are an integral part of and indispensable to their principal activities.*" (emphasis supplied)

If the test to be applied is whether the activity of travel is an integral part of and indispensable to the principal activity of installation, the answer can only be in the affirmative. As has been repeatedly stressed, defendant sold its machines installed in place and the machines were of such a nature that they could be installed in place only by traveling crews of installation employees, and it is on behalf of such employees that this suit is brought. These employees were the only persons who possessed the requisite skills to install the machines, and it is not without significance that

these employees had no principal place of activity but, rather, worked solely from job site to job site. It is concluded that § 4(a) of the Act, 29 U.S.C.A. § 254(a), does not insulate the defendant from liability, Steiner v. Mitchell, supra; Mitchell v. King Packing Co., 350 U.S. 260, 76 S.Ct. 337, 100 L.Ed. 282 (1956); Mitchell v. Mitchell Truck Line, Inc., 286 F.2d 721 (5 Cir. 1961); 29 C.F.R., §§ 785.38, et seq.

■ Even if it is assumed that travel by employees was not an integral part of and indispensable to their principal activities of installation and servicing incident thereto, the record discloses that even when riding in a station wagon furnished by defendant, defendant paid the employees compensation at the rate of $1.00 for each forty miles travel. Thus, there was an express provision of the employment contract in effect between the parties, and § 4(b) of the Act, 29 U.S.C.A. § 254(b), would render defendant liable at the rates prescribed by the Fair Labor Standards Act if they are greater than the amount fixed by agreement of the parties.

The parties may compute the amounts due from defendant to the plaintiff on behalf of the four employees for whom the suit has been pressed, in accordance with their stipulation and the views expressed herein, and present a form of order entering judgment for plaintiff.

---

of any of the following activities of such employee engaged in on or after May 14, 1947—

(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

(2) activities which are preliminary to or postliminary to said principal activity or activities,

which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

(b) Notwithstanding the provisions of subsection (a) of this section which re-

lieve an employer from liability and punishment with respect to an activity, the employer shall not be so relieved if such activity is compensable by either—

(1) an express provision of a written or nonwritten contract in effect, at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer; or

(2) a custom or practice in effect, at the time of such activity, at the establishment or other place where such employee is employed, covering such activity, not inconsistent with a written or nonwritten contract, in effect at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer."