**Elbert BARNETT, Plaintiff-Appellant,**

**v.**

**A–I SCAVENGER SERVICE COMPANY, Inc., a Corporation, Defendant-Respondent.**

**No. 33847.**

St. Louis Court of Appeals, Missouri.

.  March 23, 1971.

Lusser, Hughes & Lusser, St. Louis, for plaintiff-appellant.

White, White, White & Newmark, Philip R. Newmark, Sidney Rubin, St. Louis, for defendant-respondent.

DOERNER, Commissioner.

Plaintiff instituted this action pursuant to the provisions of §§ 6, 7, and 16 of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., to recover unpaid minimum wages and unpaid overtime compensation claimed to be owed to him by defendant, together with liquidated damages and a reasonable attorney's fee. Both parties waived a jury, the cause was heard and submitted, and subsequently the court rendered its judgment, the pertinent part of which reads:

"  *   *   *   the Court does find in favor of defendant and against plaintiff and does find that plaintiff was not during his employment with defendant 'engaged in commerce or the production of goods for commerce' within the meaning of the Fair Labor Standards Act. Judgment for defendant at the cost of plaintiff."

Plaintiff's appeal followed.

Defendant is a Missouri corporation engaged exclusively in the collection and disposal of garbage, rubbish, trash, and waste in the City of St. Louis and its environs. Plaintiff was employed by the defendant on July 26, 1964 as a helper on one of defendant's refuse collection trucks, and continued in the defendant's employment in the same capacity until April 29, 1966. During that period defendant employed 6 drivers (including the president of defendant) and 9 helpers, and operated 6 trucks, 3 on commercial routes and 3 on residential routes. Defendant's answers to plaintiff's interrogatories and the testimony produced during the trial reveal that defendant had approximately 46 or 56 commercial customers (about 10 were in dispute) and about 2600 residential customers in the suburb of Olivette. The evidence further shows that as to defendant's commercial or industrial customers its drivers and helpers proceeded in its trucks to the locations on the customers' premises where trash and other waste had been accumulated in containers by the customers, emptied the containers into the trucks, and then hauled the unsorted material to a dump, where it was unloaded. According to Corman, its president, the defendant had no contractual relations with its customers to do their housekeeping work for them. At the time plaintiff was first employed all collected material was dumped at dumps located at Jefferson Barracks or on Hall Street, in Missouri, but in the first part of 1966, according to Corman, (plaintiff first said the same, but also said in October, 1965, he thought) the dump at Hall Street filled up and thereafter some, but not all, loads were also dumped at a place in Madison, Illinois, the location to which the operators of the Hall Street dump had moved.

Throughout the period of his employment plaintiff worked on a truck which in the main, according to a list furnished by him in response to an interrogatory, collected waste from what seemingly were industrial or commercial customers. He testified that he started to work each morning at 8:00 A. M., and on each day followed a

route prescribed by the defendant. Up until November, 1965, according to plaintiff, he ceased work about 4:00 P.M., on Mondays, Wednesdays and Fridays, and about 3:00 P.M. on Tuesdays and Thursdays. After November 26, 1965, plaintiff testified, he worked on all five days until approximately 6:15 P.M. Plaintiff stated that he never worked on Sunday, and worked about 4 or 5 Saturdays during the period of his employment. His salary when he started was $35 per week, at which amount it continued until November 26, 1965, when it was increased to $40. It is impossible, with any degree of accuracy, to summarize plaintiff's testimony regarding the routes which he followed. For example, on direct examination he testified that throughout the period of his employment his first stop every morning was at the Dura Chrome Corporation, but on cross-examination he stated that in June or August, 1965, after a new driver was assigned to the truck, his first stop every Monday, Wednesday and Friday was the Small Arms Complex. An effort on cross-examination to obtain from plaintiff the route followed each day of the week, Monday through Friday, resulted only in a confused record. Perhaps it is sufficient to say that a few of defendant's customers on plaintiff's route were serviced every day, some three days a week, some two, and some one.

Section 6 of the Fair Labor Standards Act of 1938, 29 USCA Sec. 206, as it read during the time of plaintiff's employment by defendant, provided that, "Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce wages at the following rates— * * *," which the parties agreed was $1.-25 per hour during the period of plaintiff's employment by defendant. Section 7 of the same Act, during the same period, provided, in brief, that " * * * no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed; * * *."

It will be noted that only those employees are brought within the scope of the Act who, in any workweek, were engaged in "commerce" or "in the production of goods for commerce." Those terms were defined by the Congress in § 3 of the Act. Paragraph (b) of that Section provides: " 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." Paragraph (i) of the same Section reads: " 'Goods' means goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof." And paragraph (j) of the Section states, " 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any closely related process or occupation directly essential to the production thereof, in any State."

Plaintiff maintains that the court erred in its interpretation of the Act and that the evidence showed that plaintiff was covered by the Act for the reasons that (1) "Plaintiff's activities, while transporting filled refuse trucks across state lines, were 'in commerce' "; and (2) that "During the entire course of his employment by defendant plaintiff was 'engaged in the production of goods for commerce.' " Since the sec-

ond reason encompasses the plaintiff's activities referred to in the first, we consider plaintiff's points in their inverse order.

As has been repeatedly pointed out by the Supreme Court of the United States, in enacting the Fair Labor Standards Act the Congress did not exercise the full scope of its power to regulate commerce. Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S. Ct. 1116, 86 L.Ed. 1638; Mitchell v. H. B. Zachry Co., 362 U.S. 310, 80 S.Ct. 739, 4 L.Ed.2d 753. In Kirschbaum Co. v. Walling, supra, after discussing our dual form of government and " * * * the extension of federal authority over economic enterprise and its absorption of authority previously possessed by the States, * * *" 316 U.S. 520, 62 S.Ct. 1118, the court pointed out that as originally passed by the House, the bill applied to employers " * * * 'engaged in commerce in any industry affecting commerce' * * *" but as finally passed, upon the recommendation of a conference committee, it applied only to employees " * * * 'engaged in commerce or in the production of goods for commerce.' * * *" The rejection of the original wording and the substitution of the language substituted by the conference report has been said to indicate a Congressional purpose to leave local business to regulation by the states. Mitchell v. H. B. Zachry Co., supra; Walling v. Jacksonville Paper Co., 317 U. S. 564, 63 S.Ct. 332, 87 L.Ed. 460.

Expressed in many of the decisions of the Supreme Court is the observation (some might term it the complaint) that in enacting the Act the Congress furnished no guidelines for its construction of the Act. As the court said in Kirschbaum, supra, 316 U.S. 523, 62 S.Ct. 1120:

" * * * In this task of construction, we are without the aid afforded by a preliminary administrative process for determining whether the particular situation is within the regulated area. Unlike the Interstate Commerce Act, 49 U.S.C. A. § 1 et seq., and the National Labor Relations Act and other legislation, the Fair Labor Standards Act puts upon the courts the independent responsibility of applying *ad hoc* the general terms of the statute to an infinite variety of complicated industrial situations. Our problem is, of course, one of drawing lines. But it is not at all a problem in mensuration. There are no fixed points, though lines are to be drawn. The real question is how the lines are to be drawn—what are the relevant considerations in placing the line here rather than there. * * *"

The difficulty of drawing such lines is illustrated by the Supreme Court's observation that, " * * * The lower courts, and only in a lesser measure this Court, have been plagued with problems in connection with employees of buildings occupied by those having at least some relation to goods that eventually find their way into interstate commerce, * * *" 10 East 40th Street Building, Inc. vs. Callus, 325 U.S. 578, 580, 65 S.Ct. 1227, 1228, 89 L.Ed. 1806.

■ Plaintiff points out, and we agree, that in the light of the language used in § 6 of the Act it is the activities of the individual employee, and not those of the employer, which are decisive on the question of the Act's coverage. Mitchell v. H. B. Zachry Co., supra. In that connection plaintiff does not assert that in assisting in the collection and disposal of refuse he was engaged, " * * * in the production of goods for commerce" as that term is ordinarily understood. Pointing to the latter part of the definition of "produced" in § 207, he argues that his activities were in a " * * * closely related process or occupation directly essential to the production * * *" of goods. As plaintiff discusses in his brief, prior to the amendment of § 203(j) in 1949 which resulted in the present definition of the word "produced," the corresponding phrase provided that an employee was deemed to have been engaged in the production of goods if such employee was employed " * * * in any process or occupation necessary to the pro-

duction thereof, in any State." In the House-Senate conference report which discussed the amendment of the foregoing part of § 203(j) it was said:

" 'Rather the conference agreement contemplates activities which directly aid production in a practical sense by providing something essential to the carrying on in an effective, efficient, and satisfactory manner of operations which are part of an integrated effort for the production of goods * * *'

" 'Typical of the classes of employees whose work is closely related and directly essential to production, within the meaning of Section 3(j) as amended by the conference agreement are the following employees performing tasks necessary to effective productive operations of the producer: 1) office or white-collar workers * * * 2) employees repairing, maintaining, improving or enlarging the buildings, equipment or facilities of producers of goods * * * 3) plant guards, watchmen, and other employees performing protective or custodial services for producer of goods * * *'

" 'The work of such employees is, as a rule, closely related and directly essential to production whether they are employed by the producer of goods or by someone else who has undertaken the performance of particular tasks for the producer.' "

In an apparent effort to support its contention that plaintiff's activities of collecting, removing and disposing of their refuse were performed in a "closely related process or occupation directly essential to the production" of goods plaintiff at the trial called to the stand an officer or employee of three of defendant's customers whose business enterprises were serviced by plaintiff. The import of their testimony was that if the refuse from their establishments was not removed their business functions would be curtailed, affected, or eventually eliminated, and that (as to one which operated a cafeteria) uncollected garbage would create a health hazard. Of the three customers, one did not indicate whether or not it was engaged in interstate commerce, while two said they were.

Both parties cite and discuss three decisions of different Federal Courts of Appeals which have passed upon the issue of whether activities similar to those of plaintiff fall within the ambit of the Act. Our own research has disclosed none other by an appellate court. In the first case, Mitchell v. Dooley Brothers, Inc., 286 F.2d 40, decided in 1960, the Court of Appeals for the First Circuit held that such activities were so "closely related" to the operation of the defendant's customers as to bring the rubbish collectors within the coverage of the Act. In Wirtz v. Modern Trashmoval, Inc., 323 F.2d 451, handed down in 1963, the Court of Appeals for the Fourth Circuit ruled that activities similar to those of plaintiff were neither so "closely related" nor so "directly essential" to the production of goods by the defendant's customers as to extend the scope of the Act to the rubbish collectors. It is interesting to note that certiorari was applied for and denied by the Supreme Court in both Dooley and Modern Trashmoval. See, respectively, Dooley Bros., Inc. v. Mitchell, 366 U.S. 911, 81 S.Ct. 1086, 6 L. Ed.2d 236, and Wirtz v. Modern Trashmoval, Inc., 377 U.S. 925, 84 S.Ct. 1222, 12 L.Ed.2d 216.

The third case, Schultz v. Instant Handling, Inc., 418 F.2d 1019, 5 Cir., 1969, is, we believe, distinguishable on the facts from the instant case. There the parties entered into a stipulation of facts in the trial court in which it was agreed that the defendant, the trash removal company, was in fact used only by industrial and commercial companies because of the high cost of defendant's service; that the defendant furnished its customers with "specially designed containers" which ranged in size from 2 to 6 cubic yards; that those of 6 cubic yards held 1211.8 liquid gallons and were 40 times larger than the 30-gallon

maximum size containers handled by the city's garbage department; that each of the defendant's trucks were equipped with a Dempster Dumpmaster which lifted the containers and dumped their contents into the trucks; and that the trucks also had "spray mechanisms" which were used to clean the containers where required for sanitary purposes as at hospitals and restaurants. It was also stipulated that two of the defendant's customers, both of whom were major producers for interstate commerce accounted for 60% of the defendant's work during the years in question, and that defendant was required to keep a truck at all times under the waste-discharging hopper of one of such customers. It was further stipulated by the defendant that 8 of its other principal customers were regularly and substantially engaged in commerce or in the production of goods for commerce, and that waste disposal was essential to their safe and continued operation. In reaching its decision that the defendant's employees were covered by the Act the court paid little or no attention to the work of the defendant's individual employees, but instead, contrary to Kirschbaum v. Walling, supra, used as its criterion the close relationship between defendant and its customers engaged in commerce or the production of goods in commerce, particularly its two largest customers. Bottoming much of its decision on defendant's admission in the stipulation, the court said (418 F.2d 1022) "* * * that the removal of industrial waste and other debris from the premises of these and other customers was essential to the continued operation of their (the corporate and individual defendants) customers' businesses." The court distinguished Modern Trashmoval by saying that in that case there was no showing that a large proportion of Modern's business was related to production for commerce, whereas in the case before it the stipulation clearly showed such to be the case and that the defendant's employees were engaged in activities which were dedicated either exclusively or primarily to the production of goods for commerce, as in the case of Scott Paper, the defendant's largest customer.

We said that Schultz was distinguishable from the instant case because here there was no stipulation of the nature of the one entered into by the defendant in Schultz; only two of the customers from whose establishments plaintiff collected refuse were shown to be engaged in interstate commerce; and the defendant's uncontradicted evidence was that two-thirds of its business was residential in character, including about 2600 homes served in the City of Olivette on a three-times-a-week basis.

■ As stated, the basis of the court's opinion in Mitchell v. Dooley Brothers, Inc., supra, was that the employment had been shown to be "directly essential" to the production for commerce. The rationale followed in Wirtz v. Modern Trashmoval, Inc., supra, was that the trash removal services shown were not "directly essential" to the production of goods for commerce because of the degree of "remoteness" of the plaintiff's activities from the production of goods for commerce and the absence of a "dedication" to production for commerce. Relying in large measure on the decision of the Supreme Court of the United States in 10 East 40th Street Building, Inc. vs. Callus, supra, the court in Trashmoval said (323 F.2d 461):

"The trash removal activity revealed by this record 'spontaneously satisfies the common understanding of what is local business' and the employees of such an employer are engaged in local business. The generally accepted view of trash removal as a local service, carried on in a limited geographical area for the benefit of all local residents, fully supports this statement. It would stretch understanding too far to hold that the trash collector is engaged in 'producing' all the goods and services offered by his varied customers, even under the broad terms of section 3(j) of the Act (see footnote 8, supra).

"Moreover, the trash removal service provided to Modern's customers by the use-plaintiffs is more remote than the work of a porter on the premises of a manufacturing operation or in the offices of executives and administrators. The physical contact of Modern's employees with a customer may be no more than two to three minutes a week and that contact is outside of or at the periphery of the customer's operating area. How different is the 'outside' work of a trashman from a porter's intimate and regular contact *inside* the premises! We find here both a remoteness from production for commerce and the absence of a dedication, either exclusively or primarily, to production for commerce which lead us to the conclusion that the activity of the use-plaintiffs is not 'closely related' or 'directly essential' to production for commerce."

A careful consideration of both cases, as well as those cited therein, convinces us that Trashmoval is the better reasoned case. We hold, therefore, that the trial court in the instant case did not err in finding that the plaintiff was not engaged " * * * 'In * * * the production of goods for commerce' within the meaning of the Fair Labor Standards Act."

█ Plaintiff bases his contention that the plaintiff was "engaged in commerce" within the meaning of that Act on the grounds that the truck on which plaintiff had served as the helper transported some of the refuse from Missouri to the dump in Illinois. The only authority cited by plaintiff in support of his contention is Wirtz v. Sherman Enterprises, Inc., 229 F.Supp. 746, D.Md., 1964. In that case the automatic pinsetting machines sold by the defendant, and installed by the plaintiff employees in bowling alleys in other states, were clearly goods which, as the court said, (229 F.Supp. 751), had " * * * had entered the channels of interstate commerce * * *." In the instant case it can scarcely be plausibly argued that the garbage and refuse after being collected by plaintiff entered the channels of interstate commerce, or the mere transportation of such garbage and other refuse for the purpose of disposing of it could be said to be "commerce * * * among the several States * * *" within the meaning of the Act. We hold that the trial court correctly ruled to the contrary.

█ In its brief defendant asserts that the judgment was for the right party because it is exempt as a retail service and service establishment under Section 13(a) (2) of the Fair Labor Standards Act. In its reply brief plaintiff counters that the defense of exemption is a strict affirmative defense which must be specially raised in the pleadings, and that such a defense was not raised in defendant's answer. There is authority to that effect. Wirtz v. C & P Shoe Corp., 5 Cir., 336 F.2d 21. Obviously the point is belatedly raised, for it was not referred to in the findings and judgment of the trial court, nor elsewhere in the record before us. The defense of exemption (whether pleaded or not was not stated) was given as an additional, but not the primary reason, for the decision in Trashmoval, supra. The question of whether defendant was required to affirmatively plead the exemption is academic, for in any event defendant's evidence did not bring it within the terms of the exemption. As we construe Section 213(a) (2) (iv), to be exempt even a service enterprise must have a dollar volume of sales " * * * which is less than $250,000." There is nothing in the record which shows the dollar volume of defendant's business.

For the reasons stated, the judgment is affirmed.

PER CURIAM:

The foregoing opinion by DOERNER, C., is adopted as the opinion of this court.

Accordingly, judgment affirmed.

WOLFE, P. J., and DOWD, J., concur.

BRADY, J., not sitting.