George P. SHULTZ, Secretary of Labor,
United States Department of Labor,

v.

**BLAUSTEIN INDUSTRIES, INC.,**
a corporation.

George P. SHULTZ, Secretary of Labor,
United States Department of Labor,

v.

**CHARLES STREET DEVELOPMENT
CORPORATION.**

Civ. Nos. 20250, 20251.

United States District Court,
D. Maryland.

Jan. 18, 1971.

Marshall H. Harris, Deputy Regional Sol., U. S. Dept. of Labor, Phila., Pa. (Charles Donahue, Sol. of Labor, Louis Weiner, Regional Atty. and Daniel W. Teehan, Atty. U. S. Dept. of Labor, on brief), for plaintiff.

John S. McDaniel, Jr., Morton A. Sacks, and Cable, McDaniel, Bowie & Bond, Baltimore, Md., for defendants.

THOMSEN, District Judge.

In these companion actions, which have been consolidated for trial and heard by the court without a jury, the Secretary of Labor seeks to enjoin the defendants from alleged violations of the Fair Labor Standards Act, as amended, 29 U.S.C.A. § 201, et seq., by failing to pay to building service employees the minimum wages and overtime required by the Act. The respective defendants are (in No. 20251) Charles Street Development Corp. (CSDC), owner-operator of the Blaustein Building in Baltimore, and (in No. 20250) Blaustein Industries, Inc. (B Ind.), owner-operator of the Davison Chemical Building, also in Baltimore.

The Government argues that the employees engaged in the maintenance and operation of the respective buildings are covered by the Act on one or more of the following bases:

I. That the employees are covered because the great majority of the space in both buildings is occupied by tenants engaged in the production of goods for commerce within the meaning of the Act, and the building service employees are engaged in a closely related process or occupation directly essential to the production of such goods.

II. That several classes of individual employees are covered because of their individual activities, without regard to the tenancy of the building.

III. (A) That CSDC, in the operation of the Blaustein Building, is itself an "enterprise" within the meaning of § 3(s) (3) of the 1961 amendments to the Act; and (B) that B Ind., together with CSDC or American Trading and Production Corp. (Atapco), or both, constitute an "enterprise" within the meaning of § 3(s) (3) of the 1961 amendments, and the Davison Chemical Building is an "establishment" of that enterprise.

IV. That each defendant constitutes an "enterprise" within the meaning of § 3(s) (1) of the 1966 amendments to the Act, effective February 1, 1967.

Defendants deny that any of their employees are covered under any of the provisions of the Act. They have, however, been paying overtime and minimum wages to their employees since July 1, 1970, when Article 100, § 81 of the Annotated Code of Maryland took effect.

Points I and II, dealing with "traditional" coverage, are controlled by the familiar provisions of §§ 6 and 7 of the Act, as amended from time to time, 29 U.S.C.A. §§ 206 and 207, and by § 3(j), as amended in 1949, 29 U.S.C.A. § 203 (j). See note 5, below. Points III and IV, dealing with the "enterprise" concept, require a consideration of the 1961 and 1966 amendments to the Act, which will be discussed under the heading "Enterprise Coverage", below.

### Facts

Elaborate stipulations have been filed in both cases, and some testimony has been taken. There is no dispute about any of the historical facts, and they will be set out summarily herein.

### Findings

1. Charles Street Development Corporation (CSDC), defendant in No. 20251, owns and operates the Blaustein Building, a 26-story office building, located at One North Charles Street, Baltimore, Maryland. It also owns other real

estate in Baltimore, some improved and some unimproved.

At all relevant times until May 1, 1968, the capital stock of CSDC was owned 25% by American Trading and Production Corporation (Atapco), 25% by Blaustein Industries, Inc. (B Ind.), defendant in No. 20250, and 50% by the McCloskey family. On May 1, 1968, Atapco and B Ind. each acquired one-half of the McCloskey stock in CSDC. The officers and directors of CSDC are also officers, directors and employees of Atapco, and some of them are also officers and/or directors of B Ind.

2. B Ind. is a Maryland corporation which owns and operates the Davison Chemical Building, a multi-story office building, located at 101 North Charles Street. At all relevant times, Jacob Blaustein and his descendants owned all the stock of B Ind., except certain shares of preferred stock owned by charitable foundations. Until April 1, 1970, B Ind. owned and operated a radio station in Omaha, Nebraska. It also owns a substantial part of the stock of CSDC. See Finding 1, above. All of the officers and directors of B Ind. are also officers and/or directors of Atapco.

3. Atapco is a Maryland corporation which is engaged in various activities, including: (a) the ownership and operation of tank vessels engaged in the world-wide transportation of petroleum, petroleum products, other liquid materials and grain; (b) the exploration for and production of oil and gas in the United States and Canada; (c) the ownership and operation of three manufacturing plant divisions, with plants and/or operating headquarters in Ohio, New Jersey and Wisconsin; (d) the ownership and operation directly or through subsidiaries of real estate projects or interests therein in various parts of the United States, including an office building in Los Angeles, California, an interest in an office building in San Diego, California, garden apartments in Dallas, Texas, and Baltimore County, Maryland, a motel in Atlanta, Georgia, and a high-rise apartment (under construction) in Virginia; and (e) the management of interests in other corporations. Both the maritime oil and gas manufacturing and the real estate operations of Atapco have annual gross receipts substantially in excess of $1,000,000.

Atapco owns a substantial stock interest in CSDC. See Finding 2 above. Some of Atapco's officers, directors and employees are officers, directors and employees of CSDC and B Ind. All of the capital stock of Atapco is owned beneficially by descendants of the late Louis Blaustein (father of Jacob) and certain charitable foundations.

Atapco leases two floors in the Blaustein Building, at which it has many more than two employees, substantially all of whom have been engaged either in interstate commerce or in a closely related occupation directly essential to the production of goods for interstate commerce. At all pertinent times, Atapco has provided accounting and administrative services, including the maintenance of books of account, issuance of checks and preparation of tax returns for B Ind. and CSDC, which pay service fees to Atapco.[1]

4. The Blaustein Building is occupied by about 50 tenants. American Oil Company leases six floors containing more than 60,000 sq. ft. of rentable space. Seven tenants—Atapco, Crown Central Petroleum Company, Bethlehem Steel Corporation, VanSant, Dugdale & Co. (an interstate advertising agency), Union Trust Company of Maryland, Chesapeake and Ohio Railway Co., and Ernst & Ernst—each lease one or two floors, plus, in some instances, parts of other floors. Those eight tenants account for some 70% of the space and of the rentals. The other tenants lease parts of floors ranging in size from 2% to one-tenth of 1% of the total rentable area.

1. Both B Ind. and CSDC also have employees who perform some accounting and administrative services such as maintenance and time records, ordering materials and preparing and sending out invoices.

With few exceptions, all leases provide that the premises are leased for use as "Business Offices". Annual rental income is in excess of $1,000,000.

5. Approximately 82½% of the rental income [2] received by CSDC from the rental of space in the Blaustein Building is received from concerns which are either engaged in interstate commerce or in the production of goods for commerce. The parts of the building occupied by those concerns are utilized for various purposes, including corporate headquarters, regional or district sales offices, airline ticket offices, a branch office of a brokerage firm, and a branch office bank. Employees of these concerns who work in the Blaustein Building are regularly engaged in such activities as preparing reports and maintaining records with respect to interstate transactions, sending reports and communications to and receiving reports and communications from persons outside the State of Maryland, and other actions with respect to the interstate activities of their employers. There is no manufacturing or other production of goods at the Blaustein Building except the preparation and mailing of reports and other correspondence, contracts, checks, insurance policies, airline tickets, invoices and other documents.

6. Under the terms of the leases between CSDC and the various tenants, CSDC furnishes heat, air conditioning, electric power for lighting and other purposes, water, elevator service, cleaning service and maintenance, including periodic painting and replacement of light bulbs. CSDC has about 59 employees. The amount of goods produced outside Maryland and purchased by CSDC for use in maintaining the building and for use by the tenants is substantial.

7. The employees of CSDC at the Blaustein Building fall into the following categories:

(a) Charwomen engaged in cleaning specific floors or portions of floors, including tenants' offices. They regularly remove large amounts of trash,[3] which is placed in the hallway outside the elevator, where it is picked up by porters, baled and sold by CSDC to Dixie Waste Paper Co. Some five tons of trash paper are removed from the Blaustein Building each week by Dixie, which sells it to the Chesapeake Paperboard Co. The paper is put into hydropulpers, water is added, impurities removed, and approximately 60% of the resulting paperboard is sold to out-of-state buyers.

(b) Porters, who carry the waste paper and other trash downstairs. They also regularly and recurrently carry electric light bulbs and other supplies from the dock to the lower level, where they are stored, or from other places on the lower level to the storage room. They regularly and recurrently help truck drivers unload supplies when the trucks cannot reach the dock, and help unload rugs and other heavy material delivered to the building in trucks.

(c) A baler, who bales the paper referred to in (a), above.

(d) Cleaning matrons, who clean ladies' rest rooms and stock them with soap, towels, toilet tissue and other supplies. Sanitary napkins are placed in containers, from which they are purchased by employees of the tenants. These supplies are secured from closets, periodically restocked by a male employee.

(e) Garage attendants.

(f) Watchmen, whose services include occasionally opening the loading dock to permit trucks to unload incoming supplies. The day watchman unlocks doors,

2. $1,293,026.12 of rental income is secured from firms engaged in interstate commerce and/or in the production of goods for commerce, as compared to total annual rental income at the Blaustein Building of $1,566,182.46.

3. One charwoman, assigned to the 17th floor, occupied by Proctor & Gamble and Metropolitan Life Insurance Company, removed six or seven bags of trash nightly.

turns on the lights and checks the elevators. The night watchman occasionally receives mail which is placed on a table to be picked up by the tenants. Until sometime in 1969, the night watchman made rounds to check the building, and delivered mail to the tenants' offices while making such rounds.

(g) Scrub crew.

(h) Engineers, who run and maintain the heating and air conditioning equipment, replace ballasts for lights, drill holes for electrical and telephone lines, and perform routine maintenance and repair. Recurrently, about once a week they help to unload trucks delivering supplies to the building, and about as often help carry supplies from the dock to the engine room level, where they are stored. The chief engineer orders the needed supplies, many of which are produced outside Maryland.

(i) Utility men, engaged in replacing lights throughout the building and otherwise performing routine and minor repairs and maintenance work.

(j) A night supervisor and one office employee, who generally performs clerical and secretarial service for the building manager, including the typing of correspondence and purchase orders.

8. The Davison Chemical Building was purchased by B Ind. from W. R. Grace & Co. shortly after Grace merged with Davison Chemical Company in 1954. The Davison Chemical Division of Grace has been the principal tenant of the building. It rents 40,732 sq. ft., approximately 85% of the total rentable space. There are only five other tenants. About 3% of the rentable space is leased by Pan American World Airways and by Hirsch and Company, a stock brokerage firm.[4] The balance of the space is occupied by a jewelry store and a custom tailoring establishment, neither of which

leases are much as 1% of the rentable space.

9. The space leased by W. R. Grace & Co. is utilized as the main administrative offices of its Agriculture Chemical Group and its Davison Chemical Division. The Agriculture Chemical group manufactures various types of fertilizer; it has some 800 plants, outlets, warehouses and marketing facilities located in 45 states. The Davison Chemical Division has eight manufacturing plants in Maryland, five other states and Canada; it manufactures catalysts, which are used by large oil companies in the production of gasoline, and silica gel, which is used by many industries to dehydrate many products sold in interstate commerce. The Agriculture Chemical Group does a volume of business of approximately $300,000,000 a year and the Davison Chemical Division approximately $50,-000,000.

The President and Executive Vice-President of the Davison Chemical Division and the Assistant Secretary, Vice-President and Controller of the Agriculture Chemical Group are located at the Davison Chemical Building. The administrative offices located at the Davison Chemical Building include: a traffic department, which supervises the shipment of goods throughout the United States; a purchasing department, which purchases raw materials from sources both within and outside the State of Maryland for shipment and delivery to plants located throughout the United States; a credit office, which handles financing for the various plants of the Davison Chemical Division; an accounting department, which prepares consolidated financial statements for the Agriculture Chemical Group; and a banking department, which handles all banking arrangements. Salesmen covering territories throughout the United States regularly send in re-

---

4. The space leased by Pan American World Airways is utilized as a branch sales office for the selling of airline tickets for destinations throughout the United States and foreign countries. The space occupied by Hirsch & Co. is utilized for a stock brokerage office with regular and recurring receipt and shipment of money, checks and other financial instruments, stock certificates and bonds from and to points outside the State of Maryland.

ports and sales orders to the sales office in the Davison Chemical Building, and purchase orders are forwarded from offices in the building to the several production plants. The plants send various types of information for processing by a computer located in the Davison Chemical Building, and the offices in the building regularly receive money from the plants for deposit and send money to the plants. There is a regular and recurring receipt and shipment of forms, reports and correspondence from and to branch plants. No manufacturing is carried on in the building, nor any production of goods for commerce except the reports, instructions and other papers used in the activities outlined above.

10. Under the terms of the leases between B Ind. and the several tenants, B Ind. furnishes heat, air conditioning, electric power for light and other purposes, water, elevator service, cleaning service and limited maintenance service, such as replacement of bulbs.

11. The categories of employees employed by B. Ind. at the Davison Chemical Building are:

(a) Charwomen, who clean and remove trash, including paper, which is sold. See Finding 7(a). Three tons of paper are sold by B Ind. to Dixie every other week.

(b) Elevator operators, whose duties are to operate elevators carrying tenants and visitors to and from all floors, carrying United States postmen delivering mail to all floors, and carrying other persons delivering material moving from shipping points outside Maryland to tenants, or moving from tenants to points outside Maryland. Although the Davison Chemical Company uses its own employees to carry out mail, the elevators carrying such employees are operated by BB Ind.'s employees.

(c) Engineers, engaged in maintaining the heating and air conditioning plants in the building, washing windows, changing light bulbs, operating elevators when necessary, and receiving and signing for incoming supplies of maintenance materials.

(d) A chief engineer, who, in addition to spending approximately 50% of his time performing duties performed by other engineers, spends approximately 50% of his time supervising other employees, keeping time sheets for other employees and ordering and stocking maintenance supplies.

(e) Porters, engaged in cleaning and maintenance activities throughout the Davison Chemical Building, not assigned to any particular portions of the building.

(f) Watchmen.

12. One man serves as building manager for both the Blaustein Building and the Davison Chemical Building. He is paid by checks issued by the real estate department of Atapco, CSDC bears 64.-52% of his salary, B Ind. bears 27.42%, and Atapco bears 8.06%.

*Discussion*

*"Traditional" Coverage*

### I

The Government argues that the building service employees of the respective defendants are covered because the great majority of the space in both buildings is occupied by tenants engaged in the production of goods for commerce within the meaning of the Act, and the building service employees are engaged in a closely related process or occupation directly essential to the production of such goods.

Between 75 to 85% of the space in each building is occupied by tenants who are engaged in the production of goods for commerce in the space leased to them, as the term "production of goods for commerce" has been construed by the Courts. Western Union Telegraph Co. v. Lenroot, 323 U.S. 490, 65 S.Ct. 335, 89 L.Ed. 414 (1945); Allen v. Atlantic Realty Co., 384 F.2d 527, 529 (5 Cir. 1967); Beneficial Finance Co. of Wisconsin v. Wirtz, 346 F.2d 340 (7 Cir. 1965); Public Building Authority of Birmingham v. Goldberg, 298 F.2d 367, 369–370 (5 Cir. 1962); Union National Bank of Little Rock, Ark. v. Dur-

kin, 207 F.2d 848 (8 Cir. 1953); Darr v. Mutual Life Ins. Co. of New York, 169 F.2d 262 (2 Cir.), cert. denied, 355 U.S. 871, 69 S.Ct. 166, 93 L.Ed. 415 (1948); Bozant v. Bank of New York, 156 F.2d 787 (2 Cir. 1946). See Findings 5, 6, 10, 11, 12 and 13.

■ However, to sustain "traditional" coverage, the Government must also show that the building service employees are engaged in a "closely related process or occupation directly essential to the production" of such goods. § 3(j), as amended in 1949. 29 U.S.C.A. § 203(j).[5]

The starting point for a consideration of this question must be a series of cases in which the Supreme Court applied the language of § 3(j) before the 1949 amendment: Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638 (1942); Borden Co. v. Borella, 325 U.S. 679, 65 S.Ct. 1223, 89 L.Ed. 1865 (1945); and 10 East 40th Street Building, Inc. v. Callus, 325 U.S. 578, 65 S.Ct. 1227, 89 L.Ed. 1806 (1945). The test then was whether the services were "necessary" to the production of goods for commerce. Those cases were summarized by Justice Frankfurter in Mitchell v. H. B. Zachry Co., 362 U.S. 310, 314 et seq., 80 S.Ct. 739, 4 L.Ed.2d 753 (1960), as follows:

> "In Kirschbaum Co. v. Walling, *supra*, we added what was deemed a compelled gloss to suggest the limitations of 'necessary.' We found that the jobs of · building-maintenance employees, ranging in responsibility from electrician to porter, of a loft building locally owned but tenanted by production facilities of producers for commerce, had 'such a close and immediate tie with the process of production for commerce, and [were] therefore so much an essential part of it,' that the em-

ployees' occupations were 'necessary' to production. In Borden Co. v. Borella, 325 U.S. 679 [65 S.Ct. 1223, 89 L.Ed. 1865], precisely the same formulation expressed our conclusion that maintenance employees of a producer-owned office building which was tenanted in part by the producer's central offices, but not by any production facilities, were also within the Act's coverage. In 10 East 40th St. [Building, Inc.] v. Callus, 325 U.S. 578 [65 S.Ct. 1227, 1229, 89 L.Ed. 1806], however, maintenance employees of an office building were held not to be covered. Although the building contained offices of some producers, it was locally owned, held out for general tenancy, and in fact tenanted by a miscellany of tenants. Regardful of the governing principle that coverage turns upon the nature of the employees' duties, and not upon the nature, local or interstate, of the employer's general business, we held the case distinguishable from *Borden* and *Kirschbaum* because the employment, since part of an enterprise which 'spontaneously satisfies the common understanding of what is local business,' was itself sufficiently different, despite identical employee duties, from prior cases to justify *regarding it as separate from* the 'necessary parts of a commercial process' which are within the Act. * * *" 362 U.S. at 314, 315, 80 S.Ct. at 743.

The *Zachry* case, which dealt with employees of a contractor engaged in constructing a dam for a city water system, construed § 3(j) as it now reads after the 1949 amendment. See note 5. The new requirement is somewhat stricter than the old provision, but as the Fifth Circuit, speaking through Chief Judge Tuttle, said in Public Building Author-

---

5. § 3(j), as amended in 1949, reads:
 " 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such em- ployee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any closely related process or occupation directly essential to the production thereof, in any State."

ity of Birmingham v. Goldberg, 298 F.2d 367 (5 Cir. 1962):

"* * * We think it is plain that the Zachary case did not mark a withdrawal from the court's previous views as expressed in Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638, that employees whose work was essential to the maintenance of a building devoted to the production of goods for commerce are covered employees. The court distinguished its decision in 10 E. 40th Street Co. v. Callus, 325 U.S. 578, 65 S.Ct. 1227, 89 L.Ed. 1806, by showing that the building in the 10 E. 40th Street case 'was locally owned, held out for general tenancy, and in fact tenanted by a miscellany of tenants.' The court made much of the distinction between activities which are strictly local in nature and those being national in importance." 298 F.2d at 370.

For other cases discussing the 1949 amendment, as applied to buildings, see Wirtz v. Columbian Mutual Life Ins. Co., 246 F.Supp. 198, 205–206 (W.D.Tenn. 1965), aff'd 380 F.2d 903 (6 Cir. 1967); Allen v. Atlantic Realty Co., 384 F.2d 527, 529–530 (5 Cir. 1967); Union Nat. Bank of Little Rock, Ark. v. Durkin, 207 F.2d 848 (8 Cir. 1953). See also Wirtz v. Modern Trashmoval, Inc., 323 F.2d 451, 456–457 (4 Cir. 1963).

In Thomason v. Alester G. Furman Co., 222 F.2d 421 (4 Cir. 1955), the plaintiff was the building superintendent of a seventeen story building, of which the first floor and mezzanine were occupied by a bank. An uncontroverted affidavit showed that the remainder of the building was used for an "unrestricted variety of office work". The Court followed *Callus* in holding that the building was an essentially local enterprise, notwithstanding that a number of persons or

corporations having offices therein may have been engaged in commerce or in the production of goods for commerce.

(a) *Davison Chemical Building.* The facts with respect to the Davison Chemical Building are different from the facts in *Callus* and in *Thomason.* The Davison Chemical Building was not "held out for general tenancy" and was not "tenanted by a miscellany of tenants". The Davison Chemical Division of W. R. Grace & Co. has occupied most of the space ever since the Blaustein interests bought the building from Grace. It occupied 85% of the space during the years in question in this case, where its employees engaged in activities generally similar to those in *Borden.* See Findings 8 and 9.

[2] The building service employees who perform the work outlined in Finding 11 would certainly have been covered by the Act if they had been employed by the Davison Chemical Division. *Public Building Authority of Birmingham,* supra, 298 F.2d at 370, and Allen v. Atlantic Realty Co., 384 F.2d 527, 529 (5 Cir. 1967), and cases cited therein.[6] The reasoning of Judge Tuttle in *Public Building Authority of Birmingham* and in *Allen* is persuasive authority for holding that the building service employees in the Davison Chemical Building are covered by the Act, even though they are employed by the owner of the building and not by Davison. Davison and its employees are engaged in the production of goods for interstate commerce in the Davison Chemical Building within the meaning of the Act, and this Court finds and holds that each of the building service employees of B Ind. who perform the work outlined in Finding 11 is engaged in a "closely related process or occupation directly essential to the production" of such goods.

---

6. See also Bozant v. Bank of New York, 156 F.2d 787 (2 Cir. 1946); Darr v. Mutual Life Insurance Co. of New York, 169 F.2d 262 (2 Cir.), cert. denied, 335 U.S. 871, 69 S.Ct. 166, 93 L.Ed. 415 (1948); Roberg v. Henry Phipps Estate, 156 F.2d 958 (2 Cir. 1946). In Pollard

v. Herbert J. Siegel Org., Inc., 272 F. Supp. 821 (D.Md.1967), cited by defendants, the Court was dealing with an apartment building, none of whose tenants were engaged in "the production of goods for commerce".

(b) *Blaustein Building.* The Blaustein Building, owned by CSDC, presents a different set of facts, falling between the facts presented by the case of the Davison Chemical Building and those presented by the *Callus* and *Thomason* cases. More than 70% of the space in the Blaustein Building is and has been occupied by eight corporations—Atapco,[7] American Oil Co., Bethlehem Steel, C & O Railroad, Crown Central Petroleum Co., Union Trust Co., a national accounting firm and a large advertising agency. In the space so rented, those corporations have been engaged in the production of goods for commerce within the meaning of the Act, although no manufacturing is conducted in the building. On the other hand, most of the building has been held out for general tenancy and has been in fact tenanted by a "miscellany of tenants".

Although there are arguments which make it a close question whether all the building service employees in the Blaustein Building who perform the work outlined in Finding 7 are covered on the theory that each of them is engaged in a closely related process or occupation essential to the production of goods for commerce, the Court has concluded that the arguments to the contrary are stronger.

## II

The Government's second point is that several categories of employees in each of the buildings are covered because they were themselves engaged in commerce or in the production of goods for commerce, without regard to the nature of the tenancy of the building.

■ In applying the Act's traditional concepts of coverage, "we focus on the activities of the employees and not on the business of the employer." Mitchell v. Lublin, McGaughy & Associates, 358 U.S. 207, 211, 213, 79 S.Ct. 260, 264, 3

L.Ed.2d 243 (1959); see also Kirschbaum Co. v. Walling, 316 U.S. 517, 525, 62 S.Ct. 1116, 86 L.Ed. 1638 (1942); Walling v. Jacksonville Paper Co., 317 U.S. 564, 571–572, 63 S.Ct. 332, 87 L.Ed. 460 (1943); Overstreet v. North Shore Corp., 318 U.S. 125, 132, 63 S.Ct. 494, 87 L.Ed. 656 (1943).

■ *Blaustein Building.* The stipulation and the evidence show that in the Blaustein Building charwomen were usually assigned to specific floors. The Government contends that charwomen who devoted substantially all of their time to cleaning premises of tenants who were engaged in the production of goods for commerce within the meaning of the Act were themselves engaged in a closely related process or occupation directly essential to such production, and, therefore, covered by the Act. They were not, however, employees of the tenants, and the Government has cited no cases which would enable it to prevail on this argument if it should not prevail on Point I, discussed above.

■ (1) *Production of Goods for Commerce. Both Buildings.* The Government contends that charwomen, porters and other employees who regularly and recurrently remove or bale trash paper which is sold and manufactured into paper board which moves in interstate commerce are themselves engaged in the production of goods for commerce. A number of analogous cases in this and other Circuits support this argument. Wirtz v. G & W Packing Co., 324 F.2d 802 (4 Cir. 1963); Tilbury v. Mitchell, 220 F.2d 757 (5 Cir. 1955), aff'g Tilbury v. Rogers, 123 F.Supp. 109 (W.D.La.1954); Walling v. Peoples Packing Co., 132 F.2d 236 (10 Cir. 1942); Dickenson v. United States, 353 F.2d 389 (9 Cir. 1966), cert. denied, 384 U.S. 908, 86 S.Ct. 1345, 16 L.Ed.2d 360 (1966); Sams v. Beckworth, 261 F.2d 889 (5 Cir. 1958). The Sixth Circuit has held to the

7. Atapco owns one-half of the stock of CSDC, and B Ind., the defendant in the Davison Chemical case, owns the other half. Until May 1, 1968, those two Blaustein companies owned 50% of the stock in CSDC.

contrary. Houchin v. Thompson, 438 F. 2d 927 (1970); Hunter v. Madison Avenue Corp., 174 F.2d 164, 167 (6 Cir. 1949). In the latter case the Court said: "Where some inconsequential incident of interstate commerce happens to result from the general conduct of a fundamentally intrastate business, the rule of de minimis is applicable and the Act does not apply." The Fourth Circuit, however, has refused to apply the de minimis principle in analogous situations under the Act. Wirtz v. Durham Sandwich Co., 367 F.2d 810 (4 Cir. 1966); Crook v. Bryant, 265 F.2d 541 (4 Cir. 1959); see also Mabee v. White Plains Publishing Co., 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607 (1946). The case of Wirtz v. Modern Trashmoval, 323 F.2d 451 (4 Cir. 1963), must also be considered. That decision, adverse to the Government, was placed on alternative grounds; and, in view of the later decisions of the Fourth Circuit in *G & W Packing* and *Durham Sandwich*, supra, this Court concludes that the charwomen, porters and balers who regularly and recurrently handled large quantities of paper (five tons a week at the Blaustein Building and three tons every two weeks at the Davison Chemical Building) were engaged in the production of goods for commerce within the meaning of the Act.

■ (2) *In Commerce. Blaustein Building.* The engineers at the Blaustein Building, who once a week helped unload trucks bringing supplies to the building and regularly and recurrently carried supplies from the dock to the storage area, were engaged in commerce.[8] So were the matrons in the Blaustein Building, at least to the extent that they placed sanitary napkins in containers for sale. The porters in the Blaustein Building who regularly and recurrently helped unload heavy materials from trucks, and also lighter material when the trucks could not reach the dock, were also engaged in commerce.

■■ *Davison Building.* The elevator operators in the Davison Chemical Building, who regularly and recurrently carried postmen delivering mail and persons delivering materials moving in interstate commerce, and the watchmen in the Blaustein Building who regularly and recurrently received and distributed special delivery mail at night and on Saturdays, were engaged in commerce.[9]

Since this Court is holding that all of the building service employees at both buildings are covered for other reasons, it is not necessary to decide the troublesome questions of traditional coverage of the other employees.

8. See Walling v. Jacksonville Paper Co., 317 U.S. 564, 566, 572, 63 S.Ct. 332, 87 L.Ed. 460 (1943); McComb v. W. E. Wright Co., 168 F.2d 40, 42 (6 Cir. 1948), cert. den. 335 U.S. 854, 69 S.Ct. 83, 93 L.Ed. 402 (1948); Sucrs. De A. Mayol & Co. v. Mitchell, 280 F.2d 477 (1 Cir. 1960), cert. den. 364 U.S. 902, 81 S.Ct. 235, 5 L.Ed.2d 195 (1960); Mitchell (Goldberg) v. Sunshine Department Stores, Inc., 292 F.2d 645 (5 Cir. 1961); Mitchell v. Royal Baking Co., 219 F.2d 532, 533 (5 Cir. 1955); McComb v. Herlihy, 161 F.2d 568 (4 Cir. 1947); Clyde v. Broderick, 144 F.2d 348, 351 (10 Cir. 1944).

Other courts have similarly held employees handling interstate communications or handling goods continuing in commerce were engaged in commerce; e. g., Wright v. Carrigg, 275 F.2d 448, 449 (4 Cir. 1960) (truck drivers who haul mail between the post office and depot of an interstate carrier); Thompson v. Daugherty, 40 F.Supp. 279 (D.Md.1941) (same); Magann v. Long's Baggage Transfer Co., 39 F.Supp. 742 (W.D.Va. 1941) (same); Wirtz v. Wardlaw, 339 F.2d 785 (4 Cir. 1964) (insurance salesman who prepared and mailed newspaper clippings, monthly newsletters, and business cards imprinted with birthday greetings); Walling v. Bank of Waynesboro, 61 F.Supp. 384 (S.D.Ga.1945) (porter handling and carrying a bank's interstate mail); Batts v. Professional Building, Inc., 276 F.Supp. 356 (S.D.W.Va.1967) (janitors and elevator operators receiving and delivering registered letters, special delivery letters, and parcel post packages addressed to tenants in the building).

9. Cf. Pollard v. Herbert J. Siegel Org., Inc., 272 F.Supp. 821 (D.Md.1967), at note 6, supra.

*"Enterprise" Coverage*

### III

The 1961 and 1966 amendments broadened the coverage of the Act to include certain employees who are themselves not engaged in commerce or in the production of goods for commerce, but who are granted coverage under the new "enterprise" concept. The minimum wage and overtime requirements were gradually applied to these newly-covered employees.

By §§ 6(b) and 7(a) (2) of the Act, 29 U.S.C.A. §§ 206(b) and 207(a) (2), as amended in 1961, the new coverage applies to an employee who in any workweek " * * * is employed in * * * an establishment described in section 3 (s) (3) * * *", and who, except for the enactment of the 1961 amendments, would not be a covered employee.

Section 3(s) (3), 29 U.S.C.A. § 203(s) (3),[10] read as follows between 1961 and 1966:

> "(s) 'Enterprise engaged in commerce or in the production of goods for commerce' means any of the following in the activities of which employees are so engaged, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person:
>
> " * * *
>
> "(3) any establishment of any such enterprise, except establishments and enterprises referred to in other paragraphs of this subsection, which has employees engaged in commerce or in the production of goods for commerce if the annual gross volume of sales of such enterprise is not less than $1,000,000; * * *."

The 1966 amendment to § 3(s) will be discussed in Part IV of this opinion, below.

Section 3(r), 29 U.S.C.A. § 203(r), has read in pertinent part since 1961:

> "(r) 'Enterprise' means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor; * * *."

*Blaustein Building.* The Government's first point under "enterprise" coverage is that CSDC, itself, in the operation of the Blaustein Building, is an "enterprise" within the meaning of the 1961 amendments, quoted above. The two important questions are:

(1) Whether CSDC has had an "annual gross volume of sales" of not less than $1,000,000 since 1961. This is not seriously disputed. The term "sales" includes rentals received. Wirtz v. First National Bank and Trust Co., 365 F.2d 641, 645 (10 Cir. 1966); Wirtz v. Savannah Bank and Trust Co., 362 F.2d 857, 860–863 (5 Cir. 1966). See also Wirtz v. Jernigan, 405 F.2d 155 (5 Cir. 1968); Wirtz v. Allen Green & Associates, Inc., 379 F.2d 198 (6 Cir. 1967); Wirtz v. Columbian Mutual Life Insurance Co., 380 F.2d 903 (6 Cir. 1967). See also Senate Report on the 1961 amendments, 2 U.S.Code Cong. & Admin.News, 1961, p. 1651; House Report, p. 13; and the Senate Report on the 1966 amendments, Senate Report No. 1487, 89th Cong., 2d Sess., p. 7, 2 U.S.Code Cong. & Admin. News, 1966, p. 3009.

(2) Whether CSDC has had two or more employees engaged in commerce or in the production of goods for commerce, within the meaning of § 3(s), 29 U.S. C.A. § 203(s) (3).

In Wirtz v. Melos Construction Corp., 408 F.2d 626 (2 Cir. 1969), the Court said:

> " * * * the 1961 amendments expanded coverage under the Act in two particulars. First, it brought within

---

10. See P.L. No. 87–30, 75 Stat. 65 (1961), § 2(c).

the Act's coverage all employees of an enterprise if some of its employees 'engaged in commerce or in the production of goods for commerce.' Before 1961 the Act covered only those employees who were themselves so engaged. Second, the Section defined 'enterprise engaged in commerce or in the production of goods for commerce' to include an enterprise having employees engaged in 'handling, selling, or otherwise working on goods that have been moved in or produced for commerce, \* \* \*." 408 F.2d at p. 627.

The Court further stated:

"It is clear that before the 1961 amendment Melos was not subject to the Act, since it had no employees who were 'engaged in commerce or in the production of goods for commerce' as that phrase was then defined. See Mitchell v. H. B. Zachry Co., 362 U.S. 310, 80 S.Ct. 739, 4 L.Ed.2d 753 (1960). And, of course, Melos' status with respect to coverage of the Act was not affected by that part of the amendment which enlarged the Act's coverage by including all employees of enterprises which had some employees engaged in commerce or the production of goods for commerce. However Melos' operation, like many other operations which were formerly not covered by the Act, was brought under it by the extension of coverage to include enterprises that have employees engaged in 'handling, selling, or otherwise working on goods that have been

moved in or produced for commerce'." 408 F.2d at pp. 627–628.

The District Court in Wirtz v. Columbian Mutual Life Ins. Co., concluded that the "question whether the building has employees who are in commerce must be decided by applying the standards that were applicable prior to the adoption of the 1961 amendments". 246 F.Supp. 198 at 205 (1965). On appeal, the Sixth Circuit did not find it necessary to decide that question. 380 F.2d 903 (1967).

 Nor is it necessary for this Court to attempt to resolve the conflict between the statements quoted above from *Melos Construction* and *Columbian Mutual Life.* This Court has found and concluded, in II above, that the charwomen, porters and balers in the Blaustein Building were engaged in the production of goods for commerce under traditional concepts and that the porters, watchmen and matrons were engaged in commerce under the "traditional" tests. Certainly the engineers, porters, matrons, watchmen and utility men were engaged in commerce within § 3(s), quoted above.

All employees of CSDC were, therefore, covered under the 1961 amendments.

This makes it unnecessary to consider whether any of the service employees who were not engaged in commerce under traditional tests would come within the class of "employees handling, selling or otherwise working on goods that have been moved in or produced for commerce by any person \* \* \*". See § 203 (s).[11]

---

11. Defendants contend that while many of the materials used in the operation of the respective buildings are produced outside Maryland, they are not handled by the employees until they have been delivered to the building, and that they may not be considered goods within the meaning of § 203(s), because of the definition of "goods" in § 203(i), which excludes "goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof". The Government advances several arguments

against this thesis. The cases indicate that at least with respect to the sanitary napkins, hand towels, toilet paper and soap the defendants were not the ultimate consumer. Goldberg v. Furman Beauty Supply, Inc., 300 F.2d 16 (3 Cir. 1962); Shultz v. Union Trust Bank of St. Petersburg, 297 F.Supp. 1274 (M.D.Fla.1969); Wirtz v. Mayer Construction Co., 291 F.Supp. 514 (D.N.J.1968); Wirtz v. Melos Construction Co., 284 F.Supp. 717 (E.D.N.Y.1968), aff'd 408 F.2d 626 (2 Cir. 1969); Irby v. Davis d/b/a D. J. Davis Concrete Contractor, 311 F.Supp.

■ *Davison Chemical Building.* The Government's second point under the 1961 amendments is that B Ind., together with CSDC and Atapco or both, constitute an "enterprise" within the meaning of § 3(s) (3), as it has read from 1961 on, and that the Davison Chemical Building is an "establishment" of that enterprise within the meaning of § 3 (r).[12]

Findings 1, 2 and 3 show the relationship of the parties. Briefly, they show that the Blaustein family and its controlled corporations have owned and controlled B Ind. and Atapco at all material times, owned a 50% interest in CSDC until May 1, 1968, and a 100% interest in that corporation thereafter. Finding 12 shows that the Blaustein Building and the Davison Chemical Building had a common building manager, whose salary was paid by Atapco and charged partly to CSDC, partly to B Ind. and partly to Atapco itself. The interlocking directors, officers and top management of the corporations, including the Real Estate Department of Atapco, show a unified operation or common control or both for a common business purpose, sufficient to satisfy § 3(r). See Wirtz v. Barnes Grocer Co., 398 F.2d 718 (8 Cir. 1968).

If there is any doubt about including CSDC in the enterprise, because of the 50% stock interest of the McCloskeys until May 1, 1968, there can be no doubt about the fact that Atapco and B Ind. were an "enterprise" within the meaning of § 3(r). Both Atapco and B Ind. were clearly engaged in commerce from 1961 to 1970 and Atapco was clearly engaged in the production of goods for commerce. Atapco itself had sales far in excess of $1,000,000.

The Davison Chemical Building was an establishment of such enterprise. It had two or more employees engaged in commerce or in the production of goods for commerce. See Findings 9 to 12, inclusive, and discussion under II, above.

The 1961 amendments, therefore, furnish the Government a second string to its bow with respect to the Davison Chemical Building.

### IV

The Government's final argument is that each defendant constitutes an "enterprise" within the 1966 amendments to the Act, effective February 1, 1967.

Section 3(s), 29 U.S.C.A. § 203(s), as amended in 1966, reads:

"'Enterprise engaged in commerce or in the production of goods for commerce' means an enterprise which has employees engaged in commerce or in the production of goods for commerce, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person, and which—

"(1) during the period February 1, 1967, through January 31, 1969, is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level which are separately stated) or is a gasoline service establishment whose annual gross volume of sales is not less than $250,-000 (exclusive of excise taxes at the retail level which are separately stated), and beginning February 1, 1969, is an enterprise whose annual gross volume of sales made or business done is not less than $250,000 * * *."

■ The effect of the change was to eliminate the requirement that there be two or more individually covered employees engaged at the individual establishments; it is sufficient if anywhere in

---

577 (E.D.Ark.1970). Those cases need not be considered at length herein because this Court has found that more than two employees of the Blaustein Building were engaged in commerce or in the production of goods for commerce under traditional concepts.

12. This argument is necessary to bring the Davison Chemical Building within the scope of the 1961 amendments, since the annual rental income from that building did not total $1,000,000.

the enterprise employees were engaged in commerce or the production of goods for commerce "including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person".

The facts found and the discussion above show that CSDC has been, since February 1, 1967, an enterprise which had two or more employees "engaged in commerce or in the production of goods for commerce, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person".[13]

It is equally clear that B Ind. was such an enterprise and that both corporations have the requisite volume of "sales".

Counsel should agree promptly upon a judgment order based on the rulings herein and the stipulations filed in the respective cases.

13. See cases cited at note 11, supra.